U. S. INDUSTRIAL ALCOHOL COMPANY (WEST VIRGINIA), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 90713, 90714. Promulgated November 28, 1940.

*Lee I. Park, Esq.,* and *John Enrietto, Esq.,* for the petitioner.

*E. O. Hansen, Esq., Thomas H. Lewis, Jr., Esq.,* and *L. A. Spalding, Esq.,* for the respondent.

OPPER: These proceedings, which were consolidated for hearing, are for the redetermination of deficiencies in income tax as follows:

| Docket No. | Year | Deficiency |
|---|---|---|
| 90714 | 1928 | 54. $31, 785 |
| 90713 | 1929 | 16, 020. 02 |

Certain issues raised by the petitioner were abandoned by it at the hearing. Those remaining for determination are whether (1) the petitioner is entitled to a deduction from income in 1929 of $1,626,000 for exhaustion of certain contracts for the delivery of alcohol, which contracts the petitioner acquired along with certain other assets during 1929 indirectly from the Kentucky Alcohol Corporation, (2) the petitioner is entitled to deductions of $99,176.30 and $119,478.01 in 1928 and 1929, respectively, as depreciation on account of certain steel drums used in the shipment of alcohol and alcohol derivatives or, in the alternative, whether the petitioner is entitled to deductions of $102,267.83 and $124,055.54 for 1928 and 1929, respectively, as prepaid selling expenses with respect to the cost of the drums, (3) profit realized by the petitioner from the sale of capital stock owned by it in the Agni Motor Fuel Co., a wholly owned subsidiary, accrued in 1929 and, if so, whether the amount of such profit was $180,401.40 as determined by respondent, (4) the petitioner and certain affiliates are entitled to deduct in 1928 and 1929 certain amounts as losses sustained in the respective years from the abandonment of certain buildings and items of machinery and equipment and from the sale or other disposition of numerous items of other machinery and equipment, (5) deductions in the amount of $40,000 and $60,000 are allowable in 1928 and 1929, respectively, with respect to the use in those years by the Cuba Distilling Co., an affiliate of the peti-

tioner, of certain boats, and (6) deductions in the amounts of $5,779.44 and $19,066.22 are allowable in 1928 and 1929, respectively, on account of certain export taxes paid by the Cuba Distilling Co. to the Cuban Government. (7) By an amended answer the respondent alleged that for the year 1929 he erroneously allowed depreciation in excess of the correct amount with respect to depreciable properties acquired by the petitioner in that year indirectly from the Kentucky Alcohol Corporation and asked for an increase in the deficiency for that year accordingly. By the amended answer the respondent also alleged that if it be determined that certain deductions, contended for by the petitioner as allowable in 1928 on account of abandonment of property in that year, are allowable in such year then he erroneously allowed deductions for depreciation with respect thereto in 1929, and asked for an increase in the deficiency for 1929 accordingly. The proceedings were submitted upon stipulations of fact and oral and documentary evidence. The stipulated facts are found accordingly. They will be further referred to in the specific findings hereafter appearing.

For convenience, the discussion of each issue will follow immediately after the findings of fact relating thereto, and the various issues will be considered in the order previously noted. At the outset, however, and as applying to all the issues, we make the following general findings of fact.

### GENERAL FINDINGS OF FACT.

The U. S. Industrial Alcohol Co., hereinafter referred to as the petitioner, is a West Virginia corporation organized on October 17, 1906, and has its principal office in New York City.

For the calendar year 1927 the following corporations, which were incorporated under the laws of the indicated states on the dates shown, and the petitioner filed a consolidated income tax return, and throughout the calendar years 1928 and 1929 more than 95 percent of each class of the capital stock of each of such corporations was owned by the petitioner:

| | State | Date of incorporation |
|---|---|---|
| Wood Products Co.[1] | New York | Aug. 30, 1892 |
| Cuba Distilling Co. | West Virginia | Mar. 21, 1907 |
| Porto Rico Mercantile Co. | West Virginia | June 19, 1909 |
| Penn. Alcohol & Chemical Co. | New York | Feb. 24, 1911 |
| James A. Webb & Sons, Inc.[1] | New York | May 12, 1915 |
| A. L. Webb & Sons, Inc.[1] | New York | May 14, 1915 |
| U. S. Industrial Chemical Co. | Maryland | Nov. 19, 1917 |
| Curtis Bay Copper & Iron Works, Inc.[1] | Maryland | May 27, 1918 |
| James A. Webb & Son, Inc.[1] | New Jersey | Aug. 10, 1920 |
| U. S. Industrial Alcohol Sales Co. | Delaware | Nov. 25, 1921 |
| U. S. Industrial Alcohol Co.[1] | New Jersey | Aug. 3, 1926 |

[1] These corporations were finally dissolved on the following indicated dates and upon dissolution the petitioner became entitled to all the assets of each: Curtis Bay Copper & Iron Works, Inc., March 10, 1931; James A. Webb & Son, Inc. (New Jersey), July 8, 1932; U. S. Industrial Alcohol Co. (New Jersey), December 31, 1938; Wood Products Co., January 16, 1939; James A. Webb & Sons, Inc. (New York), January 16, 1939; A. L. Webb & Sons, Inc., January 16, 1939.

The Agni Motor Fuel Co., an Illinois corporation incorporated February 14, 1920, together with the petitioner and the other corporations heretofore enumerated, filed a consolidated income tax return for the calendar year 1927. During the entire calendar years 1928 and 1929 the issued and outstanding capital stock of the Agni Motor Fuel Co. consisted of 500 shares of common stock of a par value of $100 each, which throughout the calendar year 1928 and the first nine months of 1929 were owned entirely by the petitioner. U. S. Industrial Alcohol Co. (California) was incorporated under the laws of California on November 5, 1926, at which time the petitioner acquired 50 percent of each class of its stock issued and outstanding. On October 1, 1928, the petitioner acquired the remaining 50 percent of each class of the capital stock except for directors' qualifying shares and thereafter continuously owned more than 95 percent of the entire issued and outstanding capital stock of that corporation.

On June 15, 1929, and May 29, 1930, the petitioner and all of the other corporations heretofore mentioned, pursuant to extensions granted, filed with the collector of internal revenue for the third collection district of New York consolidated income tax returns for the calendar years 1928 and 1929, respectively, except that the gross income and deductions of the Agni Motor Fuel Co. for only the first nine months of 1929 were included in the return for that year. The petitioner and its subsidiaries duly filed with the respondent agreements as to the allocation of the tax for the years 1928 and 1929. The consolidated income taxes shown by the returns in the amounts of $465,015.71 and $543,682.22 for the respective years were paid by the petitioner to the collector as follows:

| Tax for 1928 | | Tax for 1929 | |
| --- | --- | --- | --- |
| Mar. 13, 1929 | $125,000.00 | Mar. 13, 1930 | $150,000.00 |
| June 15, 1929 | 108,015.71 | June 14, 1930 | 123,682.22 |
| Sept. 16, 1929 | 116,000.00 | Sept. 15, 1930 | 135,000.00 |
| Dec. 16, 1929 | 116,000.00 | Dec. 16, 1930 | 135,000.00 |
| Total | 465,015.71 | Total | 543,682.22 |

No part of the foregoing taxes was charged by the petitioner to or collected by it from any of its affiliates.

On March 22, 1930, the Agni Motor Fuel Co. filed with the collector of internal revenue for the first collection district of Illinois a corporation income tax return for the period October 1, 1929, through December 31, 1929.

On behalf of itself and its affiliates the petitioner filed with the collector on November 14, 1931, a claim for refund for 1928 in the

amount of $465,015.71 and on February 3, 1932, a claim for refund for 1929 in the amount of $543,682.22. On December 7, 1937, the petitioner filed an additional claim for refund for 1929 which recited that it was an amendment to the claim filed on February 3, 1932. In the notice of the deficiencies for 1928 and 1929, respectively, both of which are dated June 21, 1937, reference was made to the petitioner's claim or claims for refund for the respective years and the petitioner was informed that such claim or claims would be disallowed for the reason that an additional tax was due for the respective years and that official notice of disallowance would be issued by registered mail in accordance with section 1103 (a) of the Revenue Act of 1932. Other than the information contained in the deficiency notices, the respondent has mailed no final notice of disallowance with respect to any of the aforesaid claims for refund for 1928 and 1929.

At all times material herein the petitioner and each of its affiliates kept its books and filed its Federal income tax returns on the accrual basis of accounting.

There was permitted under the Act of Congress of June 7, 1906, effective January 1, 1907, the withdrawal, tax-free, of ethyl alcohol for use in the arts and industries after denaturing according to formulas prescribed by the Commissioner of Internal Revenue, destroying its character as a beverage and rendering it unfit for liquid medicinal purposes. There were permitted under an amendment to the act in 1907 withdrawals tax-free for manufacture into ether, chloroform, and other chemical substances. Denatured alcohol is classified as completely denatured and specially denatured. Among the uses of completely denatured alcohol is its use as an antifreeze in automobile radiators.

During 1928 and 1929 the petitioner directly and through subsidiaries produced from molasses and sold pure and denatured ethyl alcohol for industrial purposes. It first made pure alcohol, which was put in a bonded warehouse and when sold as denatured alcohol was denatured on withdrawal from the warehouse.

In 1928 and 1929 the petitioner owned the following industrial alcohol plants: Curtis Bay about 20 miles from Baltimore, Maryland, which was listed as Plant No. 1 by the Commissioner of Prohibition; International Plant situated in New Orleans, Louisiana, and a smaller adjoining plant known as Central Plant, the two being listed as Plant No. 2 by the Commissioner of Prohibition; Louisiana Plant situated in New Orleans and listed as Plant No. 3 by the Commissioner of Prohibition. In connection with each of the foregoing plants the petitioner owned denaturing plants and bonded warehouses. In addition to the foregoing the petitioner owned a denaturing plant and

bonded warehouse at Peoria, Illinois, and bonded warehouses at a number of cities throughout the country. It also operated sales divisions in various cities of the country. U. S. Industrial Alcohol Co. (New Jersey) owned an industrial alcohol and denaturing plant at Newark, New Jersey. U. S. Industrial Alcohol Co. (California) owned an alcohol and denaturing plant at Anaheim, California, and sold alcohol on the West Coast. Wood Products Co. was engaged in refining methanol in a plant at Buffalo, New York. In 1928 and 1929 about 25 percent of the total alcohol production of the above mentioned plants was completely denatured and sold for antifreeze purposes, about 50 percent was specially denatured according to various formulas and sold for industrial purposes, and about 25 percent was sold to the petitioner's affiliate, U. S. Industrial Chemical Co., Inc. The latter corporation had a plant of its own, situated about 1½ miles from one of the petitioner's alcohol plants, and from ethyl alcohol which it purchased from the petitioner at cost produced various derivatives of ethyl alcohol. It also manufactured certain byproducts from molasses residuum pumped to its plant subsequent to the distillation process at the petitioner's plant. U. S. Industrial Alcohol Sales Co., Inc., was a sales agent for alcohol and chemicals for the entire group in states where other subsidiaries were not qualified to do business. James A. Webb & Sons, Inc. (New York), was a selling agent in New York; James A. Webb & Son (New Jersey) in New Jersey; Pennsylvania Alcohol & Chemical Co. in Pennsylvania; A. L. Webb & Sons, Inc., in Baltimore, Maryland. The Cuba Distilling Co. and the Porto Rico Mercantile Co. were engaged in gathering and transporting molasses. Curtis Bay Copper & Iron Works, Inc., at Baltimore was engaged in manufacturing copper equipment for distilleries and general copper articles for industrial purposes. Agni Motor Fuel Co. was engaged in selling motor fuel at retail in Chicago, Illinois. The business of the last two corporations was not related to the alcohol business of the petitioner.

*Issue I.—Kentucky Alcohol Contracts.*

#### FINDINGS OF FACT.

During the World War the Kentucky Distilleries & Warehouse Co., which as a subsidiary of the United Food Products Corporation, was in the business of distilling whiskey, diverted its plants to producing alcohol (from both grain and molasses) for ammunition purposes. After the Armistice foreign markets for alcohol disappeared and it sought domestic outlets for its alcohol production. When prohibition became effective it had large quantities of whiskies which could

be sold only to the wholesale drug trade. The United Food Products Corporation went into receivership about 1921 or 1922 and upon reorganization was succeeded by the National Distillers Products Corporation, a Virginia corporation, organized on April 18, 1924, and having its principal office in New York City. On May 1, 1924, the Kentucky Alcohol Corporation, a Delaware corporation with its principal office in New York City, was organized to take over and develop the industrial alcohol business of the Kentucky Distilleries & Warehouse Co., whose business thereafter was the liquidation of its whiskey holdings. The Kentucky Alcohol Corporation, sometimes hereafter referred to as Kentucky, manufactured and sold pure alcohol and denatured alcohol—completely denatured and all forms of specially denatured.

On June 14, 1929, the National Distillers Products Corporation owned or controlled the indicated percentages of the capital stock of the following corporations:

| | |
|---|---|
| Kentucky Alcohol Corporation | 100% |
| Westwego Molasses Co | 100% |
| Solox Car Line Corporation | 100% |
| Old Time Molasses Co.[2] | 75% |
| Eastern Alcohol Corporation[3] | 50% |

On June 14, 1929, Kentucky had an established pure and denatured alcohol business which was ordinarily regarded as approximately a 10,-000,000 gallons a year business. It owned and operated an alcohol plant, denaturing plant, and bonded warehouse near New Orleans known as the Westwego Plant. It also owned and operated a denaturing plant and bonded warehouse at Peoria, Illinois, known as the Atlas Plant, and a bonded warehouse at Louisville, Kentucky. It also owned the capital stocks of the Hannis Distilling Co. and Henry H. Shufeldt & Co. Kentucky was one of the principal competitors of the petitioner and had sales connections which had been established for several years and which there was every reason to believe would continue. The principal portion of Kentucky's alcohol business was with about 40 large distributors and customers which the petitioner desired to acquire and some, if not all of which, had been distributors or customers of the petitioner at one time or another.

United Molasses Co., Ltd., sometimes hereinafter referred to as United, was a British corporation with its principal office in London, England. It was engaged in purchasing molasses in the West Indies and selling it elsewhere. Ferdinand K. Kielberg was the chairman of its board of directors and was its managing director. C. E. Adams

---

[2] National Distillers Products Corporation held an option to purchase the remaining 25 percent of the stock for $350,000.

[3] The remaining 50 percent was owned by E. I. du Pont de Nemours & Co.

was chairman of the board of directors of the petitioner and a member of its executive committee. From 1927 Adams and Kielberg had worked together in an attempt to make some arrangement with the producers of molasses whereby the price to be paid for molasses would vary with the price at which alcohol was sold. In April or May 1929 Morris Levin, Kielberg's agent in the United States, expressed to Adams the belief that United could purchase the stock owned by the National Distillers Products Co. in the Old Time Molasses Co., which was engaged in buying molasses in the West Indies, provided United could arrange for the purchase of the alcohol manufacturing business conducted by Kentucky, a business which United had no desire to acquire. Adams being familiar in a general way with the business done by Kentucky in prior years and hoping that a transfer of the control of the Old Time Molasses Co. to Kielberg would aid in the consummation of their plan for a sliding scale of prices for molasses, was willing to make an offer for the petitioner to acquire, on a fair basis, the properties of Kentucky at the same time that United should acquire the stock in the Old Time Molasses Co.

Subsequent to investigation respecting the properties of Kentucky and some discussion with Kielberg as to the provisions of an offer that would be acceptable to him, the petitioner on June 14, 1929, made an offer to Kielberg, pertinent parts of which are as follows:

You are about to make an offer to National Distillers Products Corporation to purchase the issued and outstanding capital stock of the following corporations in the following percentage as to each corporation, including an option to purchase the remaining 25% of stock of Old Time Molasses Company:

100%—Kentucky Alcohol Corporation
100%—Westwego Molasses Company
100%—Solox Car Line Corporation
75%—Old Time Molasses Company
50%—Eastern Alcohol Company

This offer is in the form hereto annexed, marked "Exhibit A". You reserve the option in the said offer to take a transfer of the assets of Kentucky Alcohol Corporation to you or your nominees.

If your offer is accepted, we agree to purchase from you on the terms, and at the price hereinafter set forth, the following assets and properties of Kentucky Alcohol Corporation, free of liability:

All lands, distilleries, plants, machinery, tools and equipment of Kentucky Alcohol Corporation, contracts and obligations of Old Time Molasses Company to deliver molasses to Kentucky Alcohol Corporation during the year 1929, and all contracts of any kind pertaining to Kentucky Alcohol Corporation's business, all allotments or permits for the production of alcohol pertaining to the business of Kentucky Alcohol Corporation, insofar as assignable, all leases, copyrights, patents, applications for patents, drawings and formulae, trade marks and trade names, unfilled orders, good will and business as a going concern, it being intended to cover by this description all of the assets of Kentucky

Alcohol Corporation, real and personal, and of every kind and description and wheresoever situated, except inventories, cash and other current assets, any contracts with E. I. DuPont de Nemours Company, and/or with Eastern Alcohol Company, the stock of H. H. Shufeldt & Company, The Hannis Distilling Company, and/or the American Medicinal Spirits Company, and real property and improvements located at Deep Water, New Jersey which are being used by the Eastern Alcohol Company. The said assets to be sold to us are shown also on the balance sheet of Kentucky Alcohol Corporation as of December 31, 1928, attached to Exhibit A, which is to bear the identifying initials of F. A. Rogers, its Vice-President.

It is understood that the representations, understandings and undertakings which are contained in the offer set forth in Exhibit A, in so far as they affect or concern the properties and assets to be purchased by us, shall run in our favor as well as yours, this offer being made subject to the verification and carrying out of such representations, understandings and undertakings.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

As the purchase price for the above described property and assets of Kentucky Alcohol Corporation, we agree to pay you $8,500,000.00, but we are to have the privilege in lieu of paying cash in the first instances, to deliver or cause to be delivered to you 51,000 fully paid and non-assessable shares, without nominal or par value, of the common stock of U. S. Industrial Alcohol Co., provided, on the same date, we procure to be purchased from you, at no expense to you, said 51,000 shares for the cash purchase price of $8,500,000.00, and you agree to sell and deliver to the purchaser or purchasers to be designated by us, said 51,000 shares on the same date and at the said price.

Upon the acceptance of your offer, Exhibit A, and this offer, we will pay to you $590,000.00 in cash, which shall be credited on the total cash purchase price. But in the event that we elect to deliver or cause to be delivered 51,000 shares of the common stock of U. S. Industrial Alcohol Co., as above described, to you, and such stock is purchased from you as hereinabove provided, you will repay to us the sum of $590,000.00. In the event that the transaction contemplated by your offer, Exhibit A, and this agreement, is not carried out for any reason, except fault on our part, the said sum of $590,000.00 shall be returned to us.

The transfer of the assets and the payment therefor, shall be made at the time specified in the offer contained in Exhibit A, but you shall have the right to advance the time of closing as therein permitted, provided that you give us notice that you have made such election, immediately upon its being made.

We further offer to purchase, conditioned upon your acceptance of the foregoing offer, 59.13% of the net liquidation value of the current assets purchased by you from National Distillers Products Corporation in excess of the liabilities assumed by you, under your contract with National Distillers Products Corporation, including your equity in the current assets of all companies in which you acquire a stock interest under your said contract, for the price of One Million, Two Hundred Fifty-six Thousand, Five Hundred Twelve Dollars and Fifty Cents ($1,256,512.50) to be paid to you in cash upon the closing date.

At the time of the transfer of the assets, you will cause to be transferred to us all of the inventories of alcohol, supplies and raw materials pertaining to the business of Kentucky Alcohol Corporation, and we will pay you at that time for the same at their book value at that date.

It is also understood that at the time of the transfer of such assets, you will procure a binding agreement with Eastern Alcohol Company providing that we shall have the privilege to distribute from time to time all industrial

alcohol distilled or being distilled by Eastern Alcohol Company, and not required by E. I. DuPont de Nemours Company, provided that our terms for such distribution shall not be less favorable than the terms obtainable by Eastern Alcohol Company from any other distributor, we to be given in all instances an opportunity for a period of ten days in each instance to meet any terms offered to Eastern Alcohol Company; such agreement shall be for the term of one year from the date hereof, and thereafter until cancelled by either party on thirty days' notice.

This offer is made subject to the approval of the Board of Directors of U. S. Industrial Alcohol Co., which will be asked at a special meeting to be held on Monday, June 17, 1929.

The completion of this transaction of course is subject to the carrying out, according to its terms, of the offer which is contained in the terms of Exhibit A; and, if, for any reason other than fault on your part said transaction contemplated by the offer contained in Exhibit A, is not completed, then neither you nor ourselves will have any liability in connection with this offer.

\*       \*       \*       \*       \*       \*       \*

The petitioner's offer was accepted by Kielberg on June 14, 1929, and the petitioner paid him $590,000 on that date. On the same day Kielberg made an offer to National Distillers Products Corporation to purchase from it the property described in the first paragraph of the offer made by the petitioner to Kielberg. Kielberg's offer was accepted on that date. In connection with its acceptance of Kielberg's offer, the National Distillers Products Corporation on June 14, 1929, signed the following, which was addressed to Kielberg:

In connection with the agreement executed between yourself and the undersigned and bearing even date herewith, the undersigned agrees that if the purchase and sale therein provided for is fully completed and the entire purchase price paid as therein provided, the undersigned will not for a period of ten years from the 31st day of August, 1929, directly or indirectly engage in the business of producing, buying, selling and distributing or handling industrial alcohol in the United States of America, except in the States of Nevada and Wyoming, and further agrees that this covenant shall run to you, your nominee or nominees, assignee or assignees and their successors.

It is further stipulated and agreed that this undertaking on the part of the undersigned is given as a part of the whole transaction embodied in such agreement, is a part of the inducing cause for your entering into such agreement, and supported by the consideration therein stated.

The contract entered into on June 14, 1929, between petitioner and Kielberg was first submitted to the executive committee of the petitioner's board of directors, which approved it, and on June 17, 1929, it was submitted to the board, which approved it and authorized and directed the issuance of 51,000 shares of the petitioner's no par value common stock in payment for the properties of Kentucky described in the contract. Prior to such authorization the petitioner's issued and outstanding capital stock was 320,000 shares.

On June 20, 1929, Kielberg elected to take the assets of Kentucky instead of its capital stock and on the same day also notified National

Distillers Products Corporation that he had transferred to United all his interest in the contract of June 14, 1929. The petitioner having obtained the agreement of a brokerage firm to purchase 51,000 shares of its capital stock for $8,500,000, on June 24, 1929, elected to deliver 51,000 shares of its stock under its contract with Kielberg. The contract between the petitioner and Kielberg was carried out substantially in accordance with its terms except that the petitioner acquired all the current assets of Kentucky and assumed all its current liabilities, as of June 15, 1929, plus those subsequently incurred prior to July 25, 1929, but acquired none of the current assets of any of the other corporations mentioned in the agreement. The transaction was closed on July 25, 1929. On that date 51,000 shares of stock in the petitioner were delivered to the brokerage firm as nominees of Kielberg and for the stock that firm issued its check for $8,500,000 in favor of Kielberg.

On July 25, 1929, Kentucky, its stockholders having previously voted to dissolve it after having authorized the disposition of its assets, conveyed directly to the petitioner by deeds all its land, buildings, and fixtures at New Orleans, Peoria, and Louisville. The other assets of Kentucky acquired by the petitioner came to it through the hands of United which, on the same date, executed a bill of sale and agreement providing in part as follows:

* * * UNITED has assigned, transferred and set over, and by these presents does assign, transfer and set over unto INDUSTRIAL, its successors and assigns, free from liability, all the properties and assets, tangible or intangible, of every nature whatsoever, formerly of KENTUCKY, including its goodwill and business as a going concern, but not including any contracts with E. I. DuPont de Nemours Company or with Eastern Alcohol Corporation, nor the stock of H. H. Shufeldt & Company, The Hannis Distilling Company, or The American Medicinal Spirits Company, nor any dividends of any description received or to be received from The Hannis Distilling Company, nor cash on hand or in bank, nor any current assets of any description whatsoever (other than inventories, supplies and raw materials), nor the real property and interests in real property, transferred and conveyed by said Indentures of even date herewith, nor the real property and improvements thereon located at Deep Water Point, New Jersey, the property and assets by this Bill of Sale and Agreement assigned, transferred and set over being more particularly described as follows:

1. All materials and supplies, finished or unfinished products, stock in trade, work in process, furniture, machinery, apparatus, tools, implements and equipment, alcohol, ethyl alcohol, denatured alcohol, molasses, denaturants, drums and alcohol containers, cooperage tanks, boilers, pipes, wiring and conduits, and all other tangible personal property, goods and chattels, wheresoever situated at the date hereof, formerly owned by KENTUCKY and assigned and transferred to UNITED as hereinbefore recited.

2. All the right, title and interest of UNITED in and to any contract made by KENTUCKY and assigned and transferred to UNITED as hereinbefore recited, for the purchase or sale of alcohol and/or molasses (except any contracts

specifically reserved from this transfer), and all allotments or permits formerly of KENTUCKY for the production of alcohol.

3. All right, title and interest of UNITED in and to the following property of KENTUCKY, assigned and transferred to UNITED as hereinbefore recited: All letters patent granted or issued by the United States of America and/or by any other country or government and application for any letters patent and all rights and interests in, to and under any letters patent so granted or issued, and applications for letters patent; all trademarks, brands and trade names, whether registered in or otherwise protected by the laws of the United States of America or any state, territory or dependency thereof or of any foreign country or government, together with the goodwill of the business in connection with which the same may be used; all copyrights; all formulae and inventions; all rights or licenses to use patents, trademarks, brands, trade names, copyrights, formulae or inventions, and all other rights in respect of any such patents, trademarks, brands, trade names, copyrights, formulae or inventions.

\*       \*       \*       \*       \*       \*       \*

The instrument also contained the following provisions:

\* \* \* INDUSTRIAL [petitioner] hereby agrees to assume and hereby does assume all the contract obligations of KENTUCKY hereby assigned and transferred, \* \* \*

INDUSTRIAL agrees to assume and complete all pending contracts formerly of KENTUCKY hereby assigned and transferred and to indemnify UNITED and its directors and its stockholders from any liability under any thereof.

By another bill of sale United transferred the property described therein as follows:

\* \* \* all the cash on hand or in the bank, and all of the current assets of every description whatsoever, formerly of KENTUCKY ALCOHOL CORPORATION.

For the current assets of Kentucky referred to in the last mentioned bill of sale the petitioner paid cash in the amount of $1,630,901.54 and assumed liabilities amounting to $668,357.30, making the total cost of such assets $2,299,258.84.

With respect to the assets acquired by the issuance of 51,000 shares of its capital stock, which stock was purchased by the brokerage firm for $8,500,000, the petitioner under date of July 29, 1929, made an entry on its books charging "Property" in the amount of $5,100,000 and crediting "Capital Stock Outstanding" with an equal amount, with the following explanation: "51,000 shares common stock issued this date for properties taken over from Kentucky Dist. Co. as per agreement filed."

Kentucky's land, buildings, machinery, and equipment, less reserve for depreciation, were carried on its books on June 15, 1929, at $1,644,516.57. Beginning in 1924 and continuing to June 15, 1929, it carried its brands, trade-marks, patents, and good will on its books at $500,000. In determining the deficiency the respondent deter-

mined the cost to the petitioner of the depreciable properties acquired by it from Kentucky to be $4,978,402. That amount plus $121,598, the amount at which the petitioner entered on its books the land acquired from Kentucky, gives $5,100,000.

In 1928 the petitioner decided not to carry any intangibles on its books and in that year wrote off accounts totaling approximately $22,000,000, which theretofore had been carried for good will, patents, trade names, and similar property. No part of the $5,100,000 charged to "Property" was allocated on the petitioner's books to good will or any other intangibles.

At June 15, 1929, the current assets of Kentucky, which were acquired by the petitioner, were carried on the books of Kentucky as follows:

| | |
|---|---|
| Cash | $103,062.40 |
| Notes and accounts receivable (less reserve) | 336,028.71 |
| Inventories of finished products, raw materials and supplies | 2,268,297.47 |
| Prepaid items | 26,001.64 |
| Total | 2,268,297.47 |

Inventories as carried on the books of Kentucky consisted of the following items at the amounts indicated:

| | |
|---|---|
| Alcohol | $1,047,137.31 |
| Molasses | 969,294.77 |
| Materials and Supplies | 77,386.90 |
| Drums and cooperage | 174,478.49 |
| Total | 2,268,297.47 |

The item of alcohol consisted of 2,308,807.27 wine gallons of pure alcohol of undisclosed proofage and 952,814.72 wine gallons of denatured alcohol of undisclosed formula or formulas, or a total of 3,261,621.99 wine gallons.[4] The item of molasses consisted of 11,029,193.53 gallons.

In 1929 approximately 40 percent of the total industrial alcohol production in the United States was sold in the form of completely denatured alcohol for use as an antifreeze in automobiles. Pure and specially denatured alcohol were sold for industrial uses, and were usually sold directly to customers. Alcohol sold in the form of antifreeze was usually sold through jobbers or distributors. Alcohol sold for antifreeze purposes is a seasonal business, usually being con-

---

[4] In the alcohol industry "wine gallon" is the measure of volume. "Proof gallon" is one wine gallon of liquid of which one-half is alcohol and one-half is water, such liquid being described as 100 proof. A gallon of alcohol 190 proof is one wine gallon of liquid of which 95 percent is alcohol and 5 percent is other material.

tracted for in maximum and minimum quantities, in the spring and shipped by the producer during the period from June or July to December. The contracts usually expired at December 31; however, in some instances deliveries continued to be made in January and February of the following year.

Included in the assets for which the petitioner issued 51,000 shares of its capital stock were 214 sales contracts which Kentucky had entered into prior to June 15, 1929, with customers and brokers or jobbers for the delivery generally on or before December 31, 1929, of pure and denatured alcohol of a total stated or estimated maximum quantity of 9,806,305 wine gallons and a stated or estimated minimum of 8,556,963 wine gallons. Of the maximum 4,492,525 gallons or 45.81 percent and of the minimum 4,083,586 gallons or 47.72 percent were for antifreeze or what is known as completely denatured alcohol formula 5 or C D 5. As a result of deliveries totaling 1,011,841 gallons made by Kentucky under these contracts prior to June 15, 1929, there remained for delivery between that date and December 31, 1929, a total maximum of 8,794,464 gallons and a total minimum of 7,545,122 gallons. Of the undelivered maximum 4,398,913 gallons or 50.01 percent and of the minimum 3,989,974 gallons or 52.88 percent were antifreeze.

The following is a statement showing the gallons of alcohol by formula entering into the above total stated or estimated undelivered maximum and minimum quantities on June 15, 1929, together with the gross price (delivered) receivable therefor, quantity discounts, and commissions payable with respect thereto and the quantity actually shipped prior to December 31, 1929:

| | Gallons | | Gross price | | Quantity discounts | | Commissions payable | | Gallons actually shipped prior to Dec. 31, 1929 |
|---|---|---|---|---|---|---|---|---|---|
| | Maximum | Minimum | Maximum | Minimum | Maximum | Minimum | Maximum | Minimum | |
| Comp. den., formula 5 | 4,398,913 | 3,089,974 | $2,235,602.00 | $2,034,358.23 | $31,633.58 | $30,556.20 | $70,609.49 | $69,375.61 | 2,326,705 |
| Comp. den., formula 1, optional CD 5 | 1,262,716 | 1,179,686 | 626,465.27 | 584,963.93 | 1,587.20 | 1,587.20 | 19,113.61 | 18,342.99 | 697,086 |
| Spec. den., formula 1, optional CD 5 | 927,933 | 752,213 | 478,558.16 | 386,552.66 | | | 10,316.48 | 7,694.98 | 727,725 |
| Pure alcohol | 963,669 | 585,701 | 394,379.99 | 254,609.47 | 10,555.98 | 6,097.62 | 41,545.91 | 27,915.87 | 1,623,857 |
| Spec. den., formula 2B | 765,200 | 664,960 | 334,550.00 | 290,536.00 | | | | | |
| Spec. den., formula 4 | 10,643 | 10,643 | 5,257.26 | 5,257.26 | | | | | |
| Spec. den., formula 19 | 9,901 | 9,901 | 7,079.22 | 7,079.22 | | | | | |
| Spec. den., formula 23A | 4,674 | 4,674 | 2,874.51 | 2,874.51 | | | | | |
| Spec. den., formula 30 | 1,669 | 874 | 988.47 | 487.62 | | | | | |
| Spec. den., formula 39B | 410,800 | 319,800 | 235,400.00 | 179,400.00 | | | | | |
| Spec. den., formula 39C | 6,250 | 6,250 | 3,062.50 | 3,062.50 | | | | | |
| Spec. den., formula 40 | 10,105 | 7,455 | 6,093.73 | 4,516.98 | | | | | |
| Spec. den., formula 40M | 12,991 | 12,991 | 7,017.65 | 7,017.65 | | | | | |
| Total | 8,794,464 | 7,545,122 | 4,337,328.76 | 3,760,775.93 | 43,767.31 | 38,241.02 | 141,585.49 | 123,229.45 | 5,375,463 |

The prices in the Kentucky contracts were at or slightly under the market prices for such products.

In general the contracts were on Kentucky's printed contract forms, which were similar to those used throughout the industry generally. The form contained the following provision:

The following goods, to be manufactured, are sold, firm and uncancelable, without any protection against decline in prices, under terms and conditions stipulated.

Shipment was made by tank cars, steel drums containing 53 gallons, which were supplied by the producer, and to a small extent in one gallon cans. Drums were returnable to the producer, who paid the return freight and bore the cost of handling and reconditioning them. To provide for such expenses and for part of the cost of filling drums, the price of alcohol in drums was slightly higher than that shipped in tank cars. The quantity of alcohol used as antifreeze was dependent to a certain extent upon winter weather conditions and there might be a substantial variation between the quantities shown in contracts entered into in the spring and that actually taken by the customer. The petitioner's practice, as well as that throughout the industry, was not to enforce acceptance by a customer of at least the minimum amount stated in his contract. In only one instance did Kentucky ever attempt to enforce such acceptance. While under his contract a customer was protected against a shortage to the extent of the maximum quantity specified in his contract, he was expected to take at least the minimum amount, but in event that was in excess of his requirements then he would be expected to take such amount as would meet his requirements. The petitioner always considered that contracts providing for maximum and minimum amounts were contracts whereunder the customers could buy their requirements from it. It was considered that the enforcement of such contracts would cause the customer to carry over an excess stock which would be sold later as distress merchandise and would result in the loss of a good customer.

The following is a statement of total alcohol production in the United States for the years 1924 through 1929, and the alcohol production and sales of the petitioner and Kentucky for the same years:

| Year | Total production in proof gallons in United States | Petitioner | | Kentucky | |
| --- | --- | --- | --- | --- | --- |
| | | Production in proof gallons | Sales in wine gallons | Production in proof gallons | Sales in wine gallons |
| 1924 | 135, 897, 725 | 51, 847, 618 | 29, 741, 457 | 14, 310, 775 | [1] 5, 382, 811 |
| 1925 | 166, 165, 517 | 59, 487, 813 | 31, 383, 033 | 28, 312, 141 | 12, 183, 563 |
| 1926 | 202, 271, 670 | 59, 728, 835 | 32, 756, 431 | 15, 207, 493 | 11, 387, 359 |
| 1927 | 184, 323, 016 | 47, 187, 030 | 26, 907, 151 | 1, 679, 083 | 9, 958, 999 |
| 1928 | 169, 149, 904 | 51, 240, 603 | 32, 578, 685 | 7, 178, 897 | 9, 171, 345 |
| 1929 | 200, 832, 051 | 55, 444, 730 | 37, 174, 742 | 2, 572, 958 | [2] 2, 863, 790 |

[1] Sales for 7 months ended Dec. 31, 1924.    [2] Sales to June 15, 1929.

The following is a statement for the period January 1, 1926, to June 15, 1929, of Kentucky's average selling price per (wine) gallon of alcohol, average cost of sales per gallon, and average gross trading profit per gallon and without deduction for depreciation, taxes, insurance, interest, general administrative expenses, etc.:

| | Average selling price per gallon | Average cost of sales per gallon | Average gross trading profit per gallon |
|---|---|---|---|
| | Cents | Cents | Cents |
| 1926 | 29.566 | 27.877 | 1.689 |
| 1927 | 33.750 | 30.246 | 3.503 |
| 1928 | 39.059 | 29.921 | 9.138 |
| 1/1/29–6/15/29 | 42.109 | 32.840 | 9.269 |

Concededly it is impossible to determine from the petitioner's records the profits attributable solely to the manufacture and sale of alcohol. The following is a statement of the total number of wine gallons of alcohol, alcohol derivatives, and chemicals sold by the petitioner and its affiliates for the periods indicated, the total selling price, including intercompany sales or transfers at cost and total net profits:

| | Total gallons sold | Total selling price | Total net profits |
|---|---|---|---|
| First 6 months of 1928 | 12,260,325 | $14,216,211.47 | $1,188,104.23 |
| Entire year of 1928 | 32,578,685 | 34,250,642.73 | 3,799,443.35 |
| First 6 months of 1929 | 12,720,635 | 17,693,101.12 | 1,696,051.78 |
| Entire year of 1929 | 37,174,742 | 41,299,506.23 | 4,721,580.40 |

Molasses from the West Indies was the raw material used by the petitioner in the production of alcohol and the cost of denaturing varied according to the denaturant used.

The cost in 1929 of making delivery of alcohol under the Kentucky contracts, including outward freight and drayage and the freight and drayage payable on returned containers, would have been $284,709.25 on the maximum quantity and $254,016 on the minimum quantity.

As of June 14, 1929, a reasonable expectation would have been that 7,500,000 wine gallons of alcohol (pure and denatured) would be delivered under the Kentucky contracts during the remainder of 1929.

Under legislation theretofore enacted and beginning October 30, 1919, permits issued by the Bureau of Prohibition of the Treasury Department were required for the operation of an industrial alcohol plant, a denaturing plant, or a bonded warehouse. Originally the permits were indeterminate as to the time and were good until revoked or surrendered. Effective October 1, 1927, annual renewals of permits for industrial alcohol plants, denaturing plants, and bonded warehouses were required. As of January 1, 1928, the quantity of alcohol

to be produced by a permittee was subject to limitation prescribed by the Commissioner of Prohibition and the amount of production permitted (designated allotment) for a given year was noted on the permit for that year. Under a Treasury decision approved in December 1928 a permittee was not permitted to produce in the first six months of a given year in excess of 40 percent of the allotment for that year and where the inventory carry-over at the end of a given year exceeded 10 percent of the allotment for that year the excess over 10 percent was to be deducted from the production allotment for the following year. A permittee could obtain an increase in the amount of his allotment upon a showing to the Commissioner of Prohibition by the permittee that the latter had commitments in excess of those for previous years which would create a legitimate need for such increase. A permit was for the particular operations of the permittee. Where the ownership of a plant changed hands the permit for the plant was voided, and the purchaser had to make application for a new permit in the same manner as an original applicant. On discontinuance of business by the permittee the allotment was extinguished. Transfers or attempted transfers of permits were not recognizable. However, if a going concern which already held a permit transferred its plant the inquiry preceding the granting of a permit to the transferee was not as extensive as in the case of an entirely new applicant. Where ownership had changed and the transferee desired to continue operations, it was the custom for the Commissioner of Prohibition to authorize production temporarily pending the filing of formal applications, bonds, etc. Under such authorization the transferee could continue the production of the quantity allotted to the transferor.

The following is a statement of the production allotments in proof gallons of Kentucky and of the petitioner effective as of January 1 of the indicated years:

|  | 1926 | 1929 |
|---|---|---|
| Kentucky | 6, 983, 955 | 13, 835, 765. 70 |
| Petitioner | 52, 648, 994 | 56, 231, 713. 00 |

On or about July 25, 1929, and pursuant to request the petitioner obtained an authorization to operate the plants of Kentucky pending the filing of application and bond and the issuance of a permit with respect thereto. On July 30, 1929, the petitioner filed a formal application for a permit to operate an industrial alcohol plant, denaturing plant, and bonded warehouse at Westwego, Louisiana, and on August 31, 1929, appropriate permits were issued. The permit for the operation of the industrial alcohol plant contained permission for the production of not more than 11,400,000 proof gallons during the period August 1 to December 31, 1929.

Of the parties whose contracts with Kentucky were acquired by the petitioner in 1929, about 35 percent of the original number of 214 with gallonage of something less than 50 percent of that involved in the contracts acquired in 1929 had continued to be customers of the petitioner as late as the middle of 1932. Of Kentucky's jobbers or brokers who operated in the following 12 cities, those operating in the 6 cities in the right hand column had continued with the petitioner as late as the middle of 1932:

| | |
|---|---|
| Boston | Chicago |
| Philadelphia | St. Louis |
| Baltimore | Cleveland |
| Pittsburgh | Indianapolis |
| Detroit | Minneapolis |
| Kansas City | Newark |

Sidney Z. Klein, who had been vice president of the Kentucky Distilleries & Warehouse Co., was vice president of Kentucky from the time of its formation until the purchase of its assets by the petitioner. As vice president of Kentucky his duties were those of sales manager and he accepted for the company contracts solicited by various salesmen and agents scattered about the country, practically all of whom were on a commission basis, the commissions being payable after delivery had been made under the contracts. As vice president of the Kentucky Distilleries & Warehouse Co., Klein managed the company's sales. During his experience with Kentucky and with the Kentucky Distilleries & Warehouse Co. Klein made many friends among the users of industrial alcohol. After the purchase of Kentucky's assets by the petitioner Klein went with the petitioner as part of its sales organization and became a vice president. In such connection he maintained contacts with the former agents, distributors, and customers of Kentucky. In addition to Klein the petitioner took over his assistant, one Carroll, and three general salesmen. Those five were all of the direct selling force of Kentucky that were taken over by the petitioner and their aggregate salaries on an annual basis amounted to about $40,000. The three salesmen, however, remained with the petitioner only two or three months.

Of Kentucky's trade names acquired by the petitioner, "Solox" was a copyrighted trade name for antifreeze. This trade name was used by the petitioner in completing contracts for antifreeze or in using packages already branded with it. Since sometime in 1930 the petitioner has used this trade name on a chemical solvent produced by it for use in the paint and varnish field. Another trade name, "Antyfreeze", acquired from Kentucky was never used by the petitioner. The petitioner had a trade name, "Pyro," under which it sold the antifreeze manufactured by it. The petitioner also acquired from Kentucky the trade name "Sunshine" which was used by Kentucky for

alcohol made from grain and sold for medicinal purposes. This trade name was used by the petitioner for about a year while the stock of grain alcohol was disposed of and was then discontinued. The petitioner acquired from Kentucky no leases, patents, applications for patents, or drawings except drawings of Kentucky's plants and equipment which it kept in its records.

The contract between Kentucky and Old Time Molasses Co., mentioned in the contract of June 14, 1929, between Kielberg and the petitioner, was an option to purchase molasses and so far as the transfer was involved was limited to the year 1929. The petitioner gave notice that the option would not be exercised and neither it nor its subsidiaries purchased any molasses under the option.

The transactions pertaining to Kentucky which occurred between June 15 and July 31, 1929, were carried into the petitioner's books of account for 1929. With an exception not here in controversy the income resulting from such transactions and the receipts thereafter in 1929 from the Kentucky contracts were included in the gross income on the petitioner's books for 1929 and in its income tax return for that year. On its books and in its return for such year deduction was taken for expenses incurred in connection with the contracts. Neither on its books nor in its income tax return for 1929 did the petitioner deduct any amount as representing exhaustion of the Kentucky contracts. In determining the deficiency for that year the respondent did not allow any amount as a deduction for exhaustion of such contracts.

Sales of stock in the petitioner were made as follows on the New York Stock Exchange on the dates indicated:

|  | June 14, 1929 | July 25, 1929 |
|---|---|---|
| Volume of sales in shares | 3,000 | 7,100 |
| High | $184½ | $182 |
| Low | 180⅛ | 178 |
| Close | 180⅛ | 182 |

OPINION.

Petitioner contends that of the 51,000 shares of its capital stock valued by it at $9,214,000, which it paid for the mixed aggregate of tangible and intangible Kentucky property, $1,626,000 represented Kentucky contracts for the delivery of alcohol during the remainder of the year 1929. It claims that such contracts became exhausted by virtue of their expiration during 1929 and that it is entitled to a deduction in that year of such amount for the cost of the contracts as a wasting asset.

The method by which petitioner arrived at the valuation of the contracts, whether or not they had any ascertainable cost and, if so,

what that cost was, need not be considered in detail for reasons which will presently appear. It should be added, however, that the only one of petitioner's principal officers who fixed any value for the contracts at the time the purchase was being negotiated was Adams, the chairman of petitioner's board of directors; that he in his own mind distributed the original purchase price of $8,500,000 among the assets purchased, attributing $5,100,000 to the tangible property, $1,500,000 to the contracts for the delivery of alcohol and $1,900,000 to good will and other benefits to be acquired; that no apportionment of the stated purchase price appears in the contract of June 14, 1929, by which the Kentucky business was acquired, nor in the resolution of approval of the petitioner's board of directors; and that no reference to any cost for the sales contracts appears in petitioner's comprehensive books or as a claim for exhaustion in its income tax return.

Adams testified that in fixing a purchase price of $8,500,000 for the Kentucky assets acquired for stock he allocated $1,500,000 to the sales contracts for the sole reason that that was the minimum amount of profits which he thought petitioner would realize on deliveries to be made under the contracts during the remainder of 1929; that the amount of $1,500,000 was based on estimated deliveries of approximately 7,500,000 gallons; that such benefits as might fall to the petitioner in years subsequent to 1929 as a result of the acquisition of the contracts were included in the $1,900,000 allocated to good will and other intangible benefits; that he would not have purchased Kentucky's other assets without the contracts; that he would not have paid $1,500,000 for the contracts unless he had acquired the other assets of Kentucky or had been given a guarantee that the contracts would produce that amount of profits; but that he would have bought the contracts for some unstated amount provided Kentucky agreed to cease business until the end of 1930 and turn over its good will.

The parties disagree whether the sales contracts should be considered as enforceable obligations or merely as orders for the delivery of merchandise. Klein, a witness for the petitioner, who had been Kentucky's sales manager and was taken over by petitioner with the Kentucky business, testified that the practice in the industry was to try to impress upon the buyers that their contracts were sacred, and that they were if it suited the purpose of the buyers, but that if it did not suit the purpose of the buyers, the contracts were not sacred; and that the reason for not trying to enforce contracts was because it was not desired that the buyers be stocked up with alcohol that they could not use and that the good will of the buyers was needed for the next year. One of the contracts shows that the customer was to take only such amounts as ordered by it during the period April 1 to December 31, 1929. The evidence shows that in the case of at

least one other, where the customer advised that it had been offered alcohol at 4 cents a gallon below the price stated in its contract, it was given an additional cash discount in order to meet this competition; and in another instance the price was reduced, apparently voluntarily, the seller stating that it was because "since the execution of your contract * * * we have changed our price schedule." In the case of at least 19 other contracts the prices to be charged were guaranteed to be no higher than the prices offered by Kentucky's principal competitors in the fall of 1929. And in at least one other instance the purchaser was guaranteed against a decline in the price of his product. In the case of another contract there was a provision for the adjustment of the price of alcohol quarterly to reflect the cost of molasses used. Most of the contracts were for comparatively small amounts. The contracts with distributors appear to have called for deliveries to the latter only as a result of business produced as Kentucky's sales representatives. These were apparently the contracts to which Adams attached value.[5] The contracts were similar to those in use by petitioner and, in fact, by the industry generally. They were the method by which it was usual to book future orders.[6]

Whether or not such contracts were legally enforceable seems to us unimportant. As a practical matter they were regarded under the apparently universal custom of the industry not as contracts for unqualified quantities and at unchangeable prices, but as the recognized method of booking orders for future deliveries. Petitioner's officers were necessarily aware of these practices and of the essential characteristics of the relationship between contract buyer and seller, so that it is inconceivable that they could have viewed Kentucky's contracts in a different light from their own or either as anything more than orders for current deliveries booked in the only way that the industry employed for that purpose.[7] This is confirmed by the reference in the purchase contract to "unfilled orders" which so far as the record shows had no independent existence apart from the sales contracts, which, in turn, were not specifically mentioned.

We conclude that under the present facts the significance of the contracts lies not in whether or not they were legally enforceable,

---

[5] "* * * The contracts we were after were the large distributor contracts." [Tr. 97.]

[6] Petitioner's witness Carroll testified:

"Q. The practice in the industry was to book future orders on this form of contract? A. With a maximum minimum.

Q. That was the usual course of business in your industry?

A. That is true." [Tr. 991.]

[7] Adams' "allocation" of part of the purchase price to these contracts does not of course, conflict. He may well have been willing to pay that additional amount for the business as a whole in the belief that it would be returned to the company out of the current year's profits. This would be equally true of any bona fide orders for merchandise, actually on the books.

but in whether petitioner can be regarded as having acquired them with any idea that they would be enforced, or that their enforceability, if any, had value for it, or that this quality contributed in any substantial degree to the value of the business for which the purchase price was paid, so that any significant sum could be attributed to it. Under the circumstances stated, bearing in mind particularly that the prices fixed in the sales contracts were concededly at or below market, we are unable to come to the latter conclusion; but, on the contrary, are satisfied that the participation of the contracts in the present transaction was noteworthy in the same way as was apparently recognized generally in the industry; that is, that, for the purpose of determining their cost and relationship to Kentucky's business and petitioner's purchase of it, they are to be treated as of no different consequence than unfilled customer's orders in other lines of business.

This reduces the present problem to a comparatively simple question: Where a going business is purchased, the buyer acquiring good will along with other assets, do orders on the seller's books constitute a divisible asset capable of separate valuation, or are they merely the current evidence of a continuing operation, the value of which is included in "good will" and without which it would be evident that no "good will" existed? We think the latter view must be adopted. Petitioner contracted for the acquisition of all of the assets of a going business, including specifically the good will, representing present as well as future prospects for the profitable use of those assets through the sale of its products.[8] It is impossible to conceive of a going business with a good will of any value without present as well as future customers. See *Pevely Dairy Co.*, 1 B. T. A. 385, 390, 391. That these present customers are represented, pursuant to the general custom of the trade, by purchase "contracts", creates, as we have said, no distinction from other "manifestations" of the same situation, for example, subscribers to publications, the existence of which furnishes no separate depreciable item. *Successful Farm-*

---

[8] This is borne out by the testimony of Adams:

"* * * We certainly hoped and anticipated that we could—that we could keep some of this business beyond 1929. In other words there was good will there that we—that we recognized as a—as a perfectly good asset from our point of view to pay some money for." [Tr. 73.]

    *        *        *        *        *        *        *

"Q. How many salesmen—do you know how many salesmen Kentucky had at the time? A. They had very few. Everything went through distributors. Q. And by virtue of taking over these contracts you in effect took over the distributors? A. Absolutely." [Tr. 87.]

    *        *        *        *        *        *        *

Petitioner's president, Brown, testified that:

"* * * The business at that time looked as though it was very well established." [Tr. 185.]

*ing Publishing Co.*, 23 B. T. A. 150; affirmed *sub nom. Meredith Publishing Co.* v. *Commissioner*, 64 Fed. (2d) 890; certiorari denied, 290 U. S. 646; *Danville Press, Inc.*, 1 B. T. A. 1171. Only such contracts under the circumstances shown could have demonstrated the existence of any good will.[9] Since the contracts were merely the embodiment of such good will in so far as current business was concerned, and, since good will is not depreciable property,[10] we conclude that the asset which petitioner seeks to depreciate, being but a part of a larger whole[11] not subject to depreciation, was not susceptible of such treatment.

Petitioner advances *Pennsylvania Salt Manufacturing Co.*, 18 B. T. A. 1148, as the authority most nearly applicable. But we think that case presents an entirely different situation. There petitioner had purchased the assets and business of a company which at the same time made an agreement with petitioner to purchase its requirements from petitioner for a stated period. It is clear that such a contract could under no circumstances have been considered a part of the good will, since the vendor had never been a customer of itself and its contract was new business which petitioner was acquiring for the first time and not as an adjunct of the vendor's good will. That such a contract could have value and that, being in no wise connected with the acquisition of the vendor's business as a going concern, it could be separately valued, need not be questioned. This, in our view, is the most that can be ascribed to the holding in that case.

For a similar reason *Farmers Feed Co. of New York*, 17 B. T. A. 507, and similar cases cited by petitioner which involve contracts not to compete, are inapplicable here.

Finally, petitioner suggests that the amount allocated by Adams to good will is the largest amount that it will bear and hence that the difference must be attributable to the sales contracts. While, in view of what we have said, this point may require no further discussion, it may be remarked that the 7,500,000 gallons remaining to be delivered in the year 1929 was apparently no more than the normal business expected from the acquisition of Kentucky. The evidence shows that petitioner's officers considered that they were buying a 10,000,000 gallon business[12] and that average disposition for the pre-

---

[9] They represented that "reasonable expectancy of preference in the race of competition" to which Judge Cardozo refers in *In re Brown*, 242 N. Y. 1; 150 N. E. 581, 582, in a passage quoted by petitioner. In fact their aspects of greater formality than ordinary unfilled orders may have entitled them to be placed where, in the words of the same quotation: "at one extreme there are expectancies so strong that the advantage derived from economic opportunity may be said to be a certainty * * *."

[10] *Bills Bros. Memorial Corporation*, 7 B. T. A. 1182: *R. Bryson Jones*, 17 B. T. A. 1213.

[11] See *William Robert Farmer*, 1 B. T. A. 711.

[12] Brown, petitioner's president, testified: "* * * here was a company with an established business. I think ordinarily the Kentucky Alcohol was looked upon as approximately a ten million gallon business." [Tr. 182, 183.]

ceding years had been approximately that amount.[13]  Bearing in mind that more than 50 percent of the unfilled orders for 1929 were for a type of denatured alcohol of which deliveries took place in the latter half of the year, the amount of 7,500,000 gallons would represent unfilled orders as of June for a normal year of 10,000,000 gallons.[14]  Petitioner's valuations of the contracts are based upon an estimated profit of 20 cents a gallon.  This, it is true, does not include some costs which are said to have been borne in advance by Kentucky, such as advertising and the allocable part of sales expense.[15]  But the advertising cost was small, estimated by petitioner at three-fourths of a cent a gallon, and the sales overhead unimportant, the principal selling cost being commissions.  And, on the other hand, it appears that some of the contracts under consideration specified prices below market.  Petitioner's witnesses testified, moreover, that they expected no increased overhead from the addition of the Kentucky business to their own.  Assuming then that 20 cents a gallon is a fair computation of anticipated profit, the aggregate to be earned from 10,000,000 gallons would be $2,000,000 a year.  Petitioner contends in its brief that "the rate of return on tangibles ordinarily used for non-hazardous business is 8% on net tangibles and excess earnings are then capitalized at 15% to compute the value of good will."  Assuming the tangibles to have a value of $5,100,000, as petitioner asserts, and deducting 8 percent thereof or $408,000 from the $2,000,000 estimated profit, a difference of $1,592,000 or in excess of 15 percent on the approximate total investment of $10,000,000 results.  Far from indicating that the intangibles including good will were overvalued by petitioner, the contrary appears to be indicated.  On the other hand, the fact that the orders for the balance of 1929 are so nearly equivalent to the past and estimated future business of petitioner and at prices not in excess of the going rate furnishes additional weight for the conclusion that these contracts had no unusual or unique aspect distinct from regular annual operation, and that the current business so evidenced was merely the present phase of the sales power of Kentucky's business, and hence inseparable from good will as a whole.

Perceiving no error in respondent's action in refusing to allow the deduction for exhaustion of the Kentucky contracts, we sustain it.

---

[13] Year:

| Year | Sales in wine gallons | Year | Sales in wine gallons |
|------|----------------------|------|----------------------|
| 1924 | *5, 382, 811 | 1927 | 9, 958, 999 |
| 1925 | 12, 183, 563 | 1928 | 9, 171, 345 |
| 1926 | 11, 387, 359 | 1929 | **2, 863, 790 |

*Sales for 7 months ended Dec. 31, 1924.

**Sales to June 15, 1929.

[14] See footnote 13, *supra*.

[15] If such prepaid expense might be considered a depreciable asset acquired by petitioner or the actual surplus value of the contracts, as to which we express no opinion, the record fails to disclose its amount.

*Issue II.—Depreciation of Drums.*

FINDINGS OF FACT.

At all times material in these proceedings the petitioner and each of its affiliates maintained inventories of goods held for sale in the course of trade or business (other than drums) on the basis of cost or market, whichever is lower, and filed Federal income tax returns on that basis. At all times material in these proceedings the petitioner and each of its affiliates carried drums on their books on the basis of cost (a round amount for each drum fixed by the petitioner and affiliates as hereafter shown) and filed Federal income tax returns on that basis.

The petitioner did not charge off on its books or claim on its returns any amount as a deduction from gross income on account of exhaustion, wear and tear, including obsolescence, of the drums and the respondent has allowed no depreciation or obsolescence with respect thereto.

At all times material herein the regulations promulgated by the Interstate Commerce Commission required that alcohol and other inflammable liquid having a flash point similar thereto be shipped in steel containers or drums conforming to specifications fixed from time to time by the Commission. During the taxable years and prior thereto the petitioner and its affiliates in making shipments of denatured alcohol and such chemicals as did not require special type drums, used steel drums of I. C. C. Specification 5 where shipments were not made in tank car quantities or in less than drum quantities. In 1929 in addition to the foregoing type certain other drums, Specification 5B type acquired indirectly by the petitioner from Kentucky, were also used. The I. C. C. 5 steel drum was a 16-gauge, heavy-duty I-bar rolling hoop drum of 55 gallon capacity. These drums were heavier and more durable than the I. C. C. 5B type of drum. On the commercial head of the I. C. C. 5 drums there was embossed the petitioner's name. In addition there was embossed on each drum its I. C. C. specification number and its own serial number.

According to such records as are now available the petitioner had on hand in its Peoria Division on January 1, 1922, 3,809 I. C. C. 5 type drums which were carried in its plant accounts at $17,576.55. The total number of such drums which the petitioner and its affiliates had on hand or which were outstanding in the hands of customers on that date is not disclosed by the record. During the period 1922 through 1927 the petitioner and its affiliates purchased from drum manufacturers new drums of the I. C. C. 5 type as follows:

| Year | Number of drums | Actual cost |
|---|---|---|
| 1922 | 70, 664 | $365, 764. 07 |
| 1923 | 56, 699 | 350, 907. 19 |
| 1924 | 9, 664 | 53, 209. 68 |
| 1925 | 61, 805 | 336, 438. 81 |
| 1926 | 25, 720 | 140, 113. 51 |
| 1927 | 4, 330 | 23, 632. 95 |
| Total | 228, 882 | 1, 270, 066. 21 |

As part of the assets indirectly obtained from Kentucky in the transaction between the petitioner and Kielberg heretofore set forth under the preceding issue, the petitioner acquired 43,210 used drums of the I. C. C. 5B type at a cost of $170,966.

The normal useful life of new drums of I. C. C. 5 type was 10 years. The normal useful life of the I. C. C. 5B type of drums acquired by the petitioner indirectly from Kentucky in 1929 was 3 years from the date of their acquisition by the petitioner.

During the period beginning January 1, 1922, and ending December 31, 1929, the number of drums shipped by the petitioner and its affiliates under contracts with customers was not less than the following amounts for the respective years:

| | | | |
|---|---|---|---|
| 1922 | 75, 279 | 1926 | 341, 944 |
| 1923 | 201, 305 | 1927 | 228, 908 |
| 1924 | 245, 210 | 1928 | 268, 714 |
| 1925 | 311, 736 | 1929 | 308, 507 |

The record does not disclose the number of I. C. C. 5B type of drums shipped in 1929.

During the period beginning January 1, 1922, and ending December 31, 1929, the number of drums received at the plants of the petitioner and its affiliates from customers as per contracts with customers was not less than the following amounts for the indicated years:

| | | | |
|---|---|---|---|
| 1922 | 37, 718 | 1926 | 314, 327 |
| 1923 | 162, 895 | 1927 | 311, 480 |
| 1924 | 211, 187 | 1928 | 263, 949 |
| 1925 | 266, 299 | 1929 | 296, 352 |

The record does not disclose the number of I. C. C. 5B type of drums received in 1929.

During the period from January 1, 1922, to December 31, 1929, the petitioner and its affiliates junked, scrapped, or sold as unfilled second-hand drums the following number of drums:

| | | | |
|---|---|---|---|
| 1922 | 180 | 1927 | 3, 582 |
| 1923 | 1, 459 | 1928 | 5, 923 |
| 1924 | 5, 659 | 1929 | 10, 523 |
| 1925 | 902 | | |
| 1926 | 5, 969 | Total | 34, 197 |

According to such records as are now available the number of empty drums on hand at the plants of the petitioner and its affiliates was as follows on the dates indicated:

|  | 1928 | 1929 |
|---|---|---|
| Jan. 1 | 91, 883 | |
| May 30 | 144, 537 | |
| June 30 | | * 169, 502 |
| Dec. 31 | 75, 401 | ** 72, 657 |

\* Included in this amount are 43,210 drums acquired indirectly from Kentucky.
\*\* The number of drums, if any, acquired from Kentucky that are included in this amount is not shown by the record.

Upon the acquisition of new drums the petitioner and its affiliates adjusted on their books the cost thereof to the round amount of $6 per drum. The excess of that amount over cost was credited to profit and loss and apparently profit and loss was charged with the excess by which cost exceeded $6 per drum. Beginning about the end of 1921 and continuing through the taxable years here involved it was the practice of the petitioner and its affiliates to collect $6 per drum from customers to whom I. C. C. 5 type of drums had been shipped. The standard form of contract in use from some time in 1924 on under which the petitioner and its affiliates sold their products contained the following provision respecting drums:

Drums to be charged at $6.00 each, which sum must be paid with invoice for contents. Drums are returnable at $6.00 for credit to the original purchaser, if returned within 90 days in good condition and showing no evidence of abuse or use for purposes other than the original contents and provided when they are returned they are classified as "old empty drums returned." Seller will pay return freight charges on such empty drums at a rate not in excess of the rate from the point to which the drum was originally shipped.

Only two or three exceptions were made with respect to the collection of the $6 per drum and these were by special arrangement due to the fact that the customers regularly purchased special formulas and the same drums were used over and over to prevent contamination. In these cases the drums were invoiced to the purchasers at $6 each and charged to the purchasers on the petitioner's books and appeared thereon as accounts receivable but not reflected in any way in income and when the drums were returned empty the customers were credited. This procedure was to obviate the necessity of passing checks back and forth. The total number of drums involved in the two or three exceptions to the uniform practice is not disclosed.

While from time to time the petitioner and its representatives, by means of calls, circulars, placards, etc., to customers, sought the prompt return of drums, the 90-day provision contained in the contracts relative to drums was never enforced and no suits were ever filed to compel the return of drums.

During the years 1922 through 1929 drums were shipped to customers and received back from customers on an average of two to three times a year. During that same period approximately 98 percent of the drums shipped to customers were returned. An undetermined number of drums returned by customers and unfit for further use was rejected by the petitioner and its affiliates.

Prior to and during a portion of 1922 drums were carried in the accounts as property, a property card was maintained for each empty drum, and when a filled drum was shipped to a customer the card was canceled. When the empty drum was received from the customer a new property card was made. This practice was found to be impracticable and beginning in 1922 and continuing thereafter drums on hand at the plants were carried in inventory and were so shown on the balance sheets. From the time of such change and through 1929, when drums were shipped from the plants, the plant inventory was credited and when empty drums were received at the plants the inventory was charged. Prior to 1922 records of drums shipped to customers and returned by customers were kept by drum numbers. Because these records proved to be ineffective for keeping track of individual drums in the hands of customers, were productive of annoyance and controversies with customers and were expensive to maintain, their use was discontinued some time during 1922 as a matter of policy.

In 1922, following the discontinuance of the practice of keeping records of drums shipped to customers and returned by customers, the petitioner and its affiliates began the practice of paying $6 per drum or allowing credit of that amount to the person returning drums in good condition, provided the drum bore the embossed name of the petitioner or an affiliate. In 1924 the petitioner and affiliates amended the practice so as to pay or credit the amount of $6 per drum only to the person to whom the drum had been billed and shipped. Thereafter and throughout 1929 the practice as thus amended continued unchanged. Neither the $6 per drum collected from customers nor the $6 per drum paid for returned drums nor any part of such amount was treated by the petitioner as income or as an expense.

When a drum on hand was determined to be no longer usable and was junked or scrapped the inventory was credited with the $6, the amount at which it was carried thereon, and profit and loss was charged with that amount, less whatever amount, if any, was received as salvage. By reason of the identification mark thereon, the date of purchase of any individual drum could have been ascertained at the time it was shipped to a customer and at the time it was junked or scrapped or sold as junk or an unfilled secondhand drum. However, no attempt

was made to identify the particular drum that was scrapped, junked, or sold at the time it was thus disposed of.

All cash receipts for drums and alcohol were deposited in its head office bank account by the sales division in whose territory the customer was located. All payments made for drums received from customers were paid by the sales division from its "imprest fund," which was a separate account usually kept in a separate bank to avoid confusion and in which only checks from the head office could be deposited. The "imprest fund" was used by the sales division to pay its operating expenses and to make payment for drums. No separate fund was maintained in which payments received from customers were held as a deposit account from which to make payment to customers if, as, and when drums were received from them subject to the terms of the contract.

An actual physical inventory of all the material on hand at each of the plants of the petitioner and its affiliates, including empty steel drums, was taken each month. No change of any consequence in that practice has been made since 1922. In none of the years 1922 through 1929 was any depreciation accrued on the books of the petitioner and its affiliates with respect to the I. C. C. 5 and I. C. C. 5B types of drums here in controversy nor prior to November 14, 1931, were any formal claims filed with respect to the allowance of depreciation or obsolescence on said drums for any taxable year or years. The deficiency notices in these proceedings do not disclose that in determining the deficiencies in controversy the respondent disallowed the deduction of any losses taken by the petitioner and its affiliates with respect to drums junked, scrapped, or otherwise sold as unfilled secondhand drums. None of the drums with respect to which such losses, if any, were taken can now be identified.

OPINION.

Petitioner customarily shipped a portion of its product in standard steel drums. During the years in question it had a large supply of these on hand which had been purchased for the most part over the years 1922 through 1927. The cost and normal useful life of the drums are stipulated. It was petitioner's practice to collect $6 from its customers for each drum shipped, an equivalent amount being paid to the customer on return of the drum in good condition. The drums remaining on hand were carried in inventory at the $6 figure, but no depreciation was charged on petitioner's accounts either by way of periodic deductions from book value or of credits to a reserve for depreciation. No claim for such a deduction was made on its income tax returns, and it seems that it was not until November 1931 that it advanced the contention that respondent, in adjusting its income for the taxable years 1928 and 1929 which are in issue here, erroneously

failed to give credit for such depreciation. Whether he should have done so is the present issue.

The deduction from current income for depreciation on property used in the taxpayer's business is designed to give him the benefit of "the reduction, during the year, of the capital assets through wear and tear of the plant used." Its amount "is the sum which should be set aside for the taxable year, in order that, at the end of the useful life of the plant in the business, the aggregate of the sums set aside will (with the salvage value) suffice to provide an amount equal to the original cost." For practical purposes depreciation may be thought of as though "by using up the plant a gradual sale is made of it." *United States* v. *Ludey*, 274 U. S. 295. Obviously, if in the regular and usual course of business the assets in question are customarily disposed of through the period of their normal useful life by actual sales, it is of less consequence that the original cost to the business be compensated through depreciation. In fact, if the taxpayer recovers his original cost by way of sale and in addition is permitted to deduct depreciation, it seems evident that the effect would be "a double deduction for the loss of the same capital assets." *United States* v. *Ludey, supra*.

The essentially compensatory nature of the permission to offset against taxable income the amount of depreciation actually sustained results in the doctrine now clearly defined that such an allowance is not permissible even to the owner of the property if in fact the economic loss due to depreciation can not be shown to fall upon him. *Weiss* v. *Wiener*, 279 U. S. 333; *Commissioner* v. *Terre Haute Electric Co.*, 67 Fed. (2d) 697; *Mississippi River & Bonne Terre Railway*, 39 B. T. A. 995. See also *Graves, Cox & Co.*, 27 B. T. A. 546. What is a "reasonable allowance," [16] as specified by the language granting the deduction, must be determined in the light of considerations of this nature applying under the circumstances shown to exist in each case. *Chicago & North Western Railway Co.* v. *Commissioner*, 114 Fed. (2d) 882. And deductions for "straight line" depreciation and loss on ultimate disposition, which, as we have seen, may be mutually exclusive, like other "deductions and credits provided for in this title shall be taken for the taxable year in which 'paid or accrued' or 'paid or incurred', dependent upon the method of accounting upon the basis of which the net income is computed," [17] that is, "Upon the basis of the taxpayer's annual accounting

---

[16] Revenue Act of 1928.—

SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions :

\*          \*          \*          \*          \*          \*

(k) DEPRECIATION.—A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence. \*   \*   \*

[17] Revenue Act of 1928, sec. 43.

1354

period \* \* \* in accordance with the method of accounting regularly employed in keeping the books of such taxpayer." [18] "If the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income." [19]

In considering the facts disclosed in the present proceedings we are immediately confronted with the consideration that the taxpayer's regular method of accounting did not provide for annual charge-offs of depreciation but, on the contrary, appears to have contemplated that the taxpayer's original cost would be returned to it by periodic final dispositions of the property involved. See *Central Railroad Co. of New Jersey*, 35 B. T. A. 501; petition for review denied (C. C. A., 3d. Cir., Dec. 6, 1937). It is, of course, true that mere bookkeeping entries do not create income or supply us with the underlying facts upon the basis of which controversies relating thereto may be adjudicated. On the other hand, depreciation is essentially an accounting concept which to a considerable extent is a matter of hypothesis and computation. See *Illinois Pipe Line Co.*, 37 B. T. A. 1070, 1080. While it may be assumed that the gradual deterioration of property is a fact, the *quantum* of such deterioration to be attributed to individual years is seldom the product of an examination of the actual physical condition of the asset at one period or another. Cf. *Otis Steel Co.*, 6 B. T. A. 358. It is generally, on the contrary, based upon a conjecture not shown to have any connection with actuality that depreciation will be at a constant rate throughout an estimated useful life. That in fact is the basis of petitioner's computation of its present claim. In connection with such a deduction, the reference to the taxpayer's actual method of accounting is thus of more than ordinary relevance. And it may be asked, particularly with reference to an item so largely a matter of selection among several accounting practices,[20] whether, since the taxpayer is in the best position to be cognizant of its own business situation, the method of accounting adopted and retained by it, with respondent's tacit approval, may not well be accepted as presumptive evidence that such practice, rather that some other method, most clearly reflects its income. See *Chicago & North Western Railway Co.*, 39 B. T. A. 661, 666; affd., *Chicago & North Western Railway Co.* v. *Commissioner, supra.*

It is difficult to see how the petitioner's position can be supported unless we are satisfied that the method it actually used failed properly to reflect its income. For, if the method adopted by it did so, then the underlying compensatory purpose of the depreciation deduc-

---

[18] Revenue Act of 1928, sec. 41.
[19] Revenue Act of 1928, sec. 41.
[20] See *Central Railroad Co. of New Jersey, supra,* 503.

tion has been fulfilled and there is no persuasive reason why it should be substituted in order to accomplish a purpose that has already been achieved. In examining this question we must take note of the following facts.

First, petitioner's drum property consisted of a large number of units which were for the most part treated as completely interchangeable. They had a uniform estimated useful life, but were purchased in substantial quantities in each of a number of years. It follows that if such annual purchases became useless at the end of a constant period, which is the assumption upon which depreciation is claimed, the cost to the enterprise of the ultimate destruction of their value would become a reasonably standard annual expense. See *Iten Biscuit Co.*, 25 B. T. A. 870, 879. It would not forecast an extraordinary and nonrecurring item of loss in any given year so as to distort the income of that year, as is to be expected with large nonfungible items of plant such as buildings or machinery.

Second, the facts show that approximately 50 percent, if not more, of the total drum inventory was or would be disposed of by petitioner in a transaction comparable to a sale without loss to it, and in fact at a slight profit. This results from the estimates supplied by petitioner's witnesses, indicating that the average drum made two and one-half trips a year and that on each trip 2 percent, being unreturned by the customer, would be charged for on the basis of book cost, which was some 8 percent above the actual outlay. Thus out of every 100 drums on hand, 5 would be disposed of in that manner in each year, or 50 before the 10-year life of the drum was exhausted. In addition, an undisclosed number of drums returned in a damaged condition were repaired at the customer's expense. As to at least half of the property, therefore, the loss is shown to fall on others and to be of such a nature as not to entitle petitioner to compensation by way of depreciation. *Commissioner* v. *Terre Haute Electric Co., supra.*

Third, of the balance approximately 50 percent would be sold, junked, or scrapped before the end of their 10-year life, if the years in evidence are to be taken as typical. Over these 6 years 14.7 were removed from inventory by way of the methods described. At a similar rate approximately 25 out of every 100 drums would be disposed of in that manner before the end of their contemplated life. As to these it appears that petitioner obtained the benefit of loss deductions in the applicable years by charge to profit and loss of the difference between the book cost and the salvage, if any. Such items are not to be recovered through resort to the principle of depreciation. *Southland Coal Co.*, 16 B. T. A. 50.

Fourth, no records were maintained as to individual drums and the entire claim is based upon a composite average. As to any one

drum taken at random, there was on the basis of past experience as good a chance that it would be disposed of without loss as the contrary. If the proportion of unreturned drums were to increase, the chances of loss would decrease, and if it were merely doubled, that is, if 96 percent were returned instead of 98 percent, there would be no loss at all. It is difficult to say that such a loss is "actual and present, not merely contemplated as more or less sure to occur in the future." *Weiss* v. *Wiener, supra.*

It thus appears that, by means of various forms of retirement, petitioner's loss would be compensated for currently with respect to upward of 75 percent of its drum inventory; and that with respect to the balance its compensation would accrue ratably and with a fair degree of uniformity over the ensuing years. Whether it was such considerations as these which prompted petitioner to adopt the accounting method which it used is, of course, the merest speculation. But they do suffice to satisfy us that no distortion of petitioner's income [21] has been shown. See *Chicago & Northwestern Railway Co., supra.*

On the other hand it may be seriously doubted whether the adjustment now urged by petitioner could be approved without creating excessive or duplicating deductions. The depreciation is claimed by petitioner on the basis of all drums not disposed of previous to the years in question. There is no way of finding the precise age of such drums or their remaining useful life, but virtually all are supposed to have had 4 years of life and some, of course, may have had as much as 8 or 9. As we have seen, 5 percent each year, or from 20 to 45 percent, depending on their remaining useful life, will be disposed of after those years without any loss whatever. Nevertheless, depreciation is claimed on the entire number of drums. It is possible, of course, that if petitioner's income tax returns before 1928 and after 1929 contained, or could now be adjusted to include, the depreciation properly allowable on each drum so disposed of, so that petitioner would actually show a profit rather than an absence of loss on such dispositions, the excessive deductions in the years at bar might be successfully offset. But there is no evidence that any such adjustments could or have been made. The indication is to the contrary, since petitioner kept no record of the age of the drums disposed of. And in any event the situation serves to emphasize that

---

[21] It is, in fact, not entirely clear that petitioner's complaint is essentially concerned with distortion of the income of any specific year. Rather there are indications that the accounting practice it adopted now eventuates as somewhat less favorable than some other might have been, not because annual income was distorted, but because it fluctuated. This is suggested by the statement that "It produces definite injustice for it shifts to a period of loss and depression—1932 and subsequent years—deductions for exhaustion which occurred in heavy income producing years 1922 to 1929." (Pet. brief, 210.) What would be petitioner's position if the later years had been the more profitable?

the possibility of distortion of income is considerably greater if petitioner's theory be sustained at this late date than if it be rejected. See *Firemen's Insurance Co.*, 30 B. T. A. 1004.

What has been said applies specifically to the petitioner's I. C. C. 5 drums. As to the I. C. C. 5B drums purchased from Kentucky in 1929, the record is extremely reticent. Since, however, we are not furnished with any facts which indicate that the experience and treatment of these drums is radically different from the others, we must assume that the facts as to them are no more favorable to petitioner's contention than those with respect to the remaining drums, and our conclusion must be the same.

In view of what has been said it becomes unnecessary to consider the application to the present facts of *Buck* v. *Commissioner*, 83 Fed. (2d) 627 (C. C. A., 9th Cir.). We express no opinion as to whether petitioner's arrangements with its customers were more nearly bailments than sales, as petitioner contends, or, even if the former, whether respondent's contention that the drums were not property used in petitioner's trade or business may be sustained. See also *Iten Biscuit Co., supra.*

Petitioner contends in the alternative that the cost of the drums may be spread over the period of their anticipated life in the form of deductions for prepaid selling expense. This position seems to us to be susceptible to the same objections as those heretofore noted as to petitioner's principal argument. Neither its method of accounting nor the practical operation of its business indicates that petitioner is entitled to any deduction on that theory. Respondent's determination with respect to drum depreciation is sustained.

*Issue III.—Sale of Agni Motor Fuel Co.*

FINDINGS OF FACT.

Agni Motor Fuel Co., hereinafter referred to as "Agni" or "the Fuel Co.", was engaged in retailing motor fuel in Chicago. The petitioner as owner of the 500 issued and outstanding shares of capital stock of Agni carried that stock on its books under "Investments" at the amount of $50,000. The petitioner's president, Brown, and the president of the W. H. Barber Co., N. C. Beim, on some undisclosed date, but apparently on or prior to September 24, 1929, had a conversation a topic of which was the petitioner's disposition of its interest in Agni. The minutes of the regular meeting of the executive committee of the petitioner's board of directors held on September 24, 1929, contain the following:

The president [Brown] spoke regarding the Agni Motor Fuel Co., the entire capital stock of which is owned by this Company and after a discussion of that

company's affairs, it was upon motion, duly made, seconded and unanimously carried:

RESOLVED: That the proper executive officers be and they hereby are authorized to sell the Agni Motor Fuel Co. to W. H. Barbour [Barber] Co., of Chicago, Ill., for the book value and the officers were also authorized to negotiate with the W. H. Barbour Co. for the sale to that company of the land occupied by the Agni Motor Fuel Co. in Chicago, Ill., located at Archer Avenue and Southwestern Boulevard which is owned by the U. S. Industrial Alcohol Co.

On October 1, 1929, the W. H. Barber Co., hereinafter referred to as the Barber Co., and its associate, the Globe Oil & Refining Co., hereinafter referred to as the Globe Co., took charge of the operations of Agni but made no change at that time in its operating personnel. R. T. Seidel, vice president of Agni, was the officer who had been looking after the conduct of its business and he continued his duties as theretofore.

Brown and F. C. Watkins, the petitioner's auditor, carried on the negotiations with Beim, who consulted with Seidel and with I. A. O'Shaughnessy, the latter being the president of the Glode Co. On October 18, 1929, the parties fixed the purchase price of the Agni stock and the real estate to be transferred at $250,996.88. On that day Beim, by letter affirming a telephone conversation with Brown, stated:

Confirming telephone conversation of today, we are herewith enclosing the following schedules:

1. Schedule showing purchase price for the Agni Motor Fuel Company, $250,996.88.

He transmitted therewith certain schedules relative to the properties of Agni used in fixing the purchase price, together with a schedule relating to certain disbursements of Agni during the first half of October. The letter contained nothing to indicate that the sale of the properties at the agreed price was to be effective only on the signing of a formal written contract or that a formal written contract was even contemplated by the parties, but on the contrary Beim stated: "We are setting up the books in accordance with these schedules and all operations will be handled from the Chicago Office." He also stated that if desired by the petitioner an initial payment of as much as $150,000 would be made by the purchasers.

Counsel representing petitioner was unable to obtain from the available records an accurate legal description of the real estate to be transferred, which apparently was only a portion of a larger area owned by the petitioner. This necessitated a survey, which involved some delay. About the time of the completion of the survey the purchasers decided to include in the purchase certain additional real estate. By letter of December 6, petitioner's price of $10,000 additional for this property was agreed to by the purchasers. This increased the total consideration to $260,996.88.

In the same letter Beim stated: "Our attorney * * * will be back in about ten days and we will then close the deal if you will forward us the conveyance for the property or possibly that can be included in the contract, in other words we are all prepared to complete the deal as soon as the necessary papers are forwarded." He referred to a prior request of some undisclosed date that the petitioner have a contract respecting the purchase made to the Globe Co. but forwarded to him and O'Shaughnessy at Minneapolis, where it would be available to the latter. Brown replied on December 9, 1929, that the contract had been forwarded. On December 16, 1929, Beim acknowledged receipt of copies of the contract advising Brown that with a few minor changes the contract seemed to "cover our agreement"; that he had the money available for payment and that he felt it would save time for O'Shaughnessy and their attorney to confer with the petitioner's attorney in Chicago and "close the matter on the ground."

The parties through their respective attorneys arranged to formally close the deal on Monday, December 30, 1929, but due to a death in Beim's family the meeting was postponed until Thursday, January 2, 1930. On or about January 6, 1930, copies of final redraft of the formal contract which met the suggestions of the counsel for the Globe Co. and the Barber Co. were submitted by petitioner's Chicago attorney to the petitioner and to the attorney for the Globe Co. and the Barber Co. The formal contract was signed by the petitioner's officers on January 15, 1930. It was then sent to the petitioner's Chicago attorney for transmittal to the Globe Co., whose officers afterwards signed it.

The Barber Co. paid $100,000 of the purchase price by two checks dated January 13, 1930, which were received by the petitioner on or about January 23, 1930. A further payment in the amount of $50,000 was made on or about February 3, 1930. The remainder of the purchase price was paid in installments during 1930, on which interest at the rate of 6 percent per annum from September 30, 1929, was payable and was paid. The date of September 30, 1929, was used as the date from which to compute interest, as the petitioner considered that was the date on which the Agni assets were turned over to the purchasers.

The formal contract was executed by the petitioner and the Globe Co. under date of January 15, 1930, and a supplementary stipulation relative thereto was executed under the same date by the Barber Co., O'Shaughnessy, A. J. Hedlund, and Seidel. They appear as Exhibit 74 in the record.

The contract was ratified and approved by the petitioner's board of directors at the regular monthly meeting on January 23, 1930.

The petitioner's ownership of Agni was represented by certificates Nos. 8 through 13, totaling 500 shares. These certificates bear no date of assignment or endorsement. However, Internal Revenue documentary transfer stamps for all of the certificates were attached as one stamp to certificate No. 13, and were canceled in ink, with the following notation: "A. M. F. Co. 12/30/29." The stock certificate book of Agni, the canceled certificates, and the new certificates dated January 15, 1930, made out to the purchasers and their nominees, were transmitted by the petitioner to its Chicago attorney on January 16, 1930.

On February 5, 1930, the old officers of Agni resigned and new officers were elected, except that Seidel, who had been vice president, continued in office as vice president and treasurer.

The transfer of the real estate by the petitioner to the purchasers involved an easement for the use of switch tracks on the land of the petitioner and a party wall agreement. Warranty deeds, a deed granting an easement and a party wall agreement were not executed by the petitioner until October and November 1930, and the warranty deeds were not delivered to the purchasers until December 20, 1930, at which time the stock certificates were also delivered, following the payment of the final installment of the purchase price.

On September 30, 1929, the board of directors of Agni declared a dividend of the entire surplus and undivided profits of the company payable on September 30, 1929, to stockholders of record on that date. On November 30, 1929, the petitioner, being indebted to Agni in excess of $150,000, charged Agni on its books with the amount of $149,684.67 with respect to such dividend. Subsequent to January 15, 1930, the petitioner, by certain entries on its books dated December 31, 1929, gave further effect thereon to said dividend and as a result of such entries reflected on its books no gain or loss from the sale of the Agni stock, but showed a loss of $3,662.63 on the sale of the land.

By entries made subsequent to January 15, 1930, but dated December 31, 1929, the petitioner set up on its books an account receivable from the Globe Co. and associates in the amount of $270,401.40, which was the agreed purchase price of the Agni stock and real estate as stated in the formal contract of $260,996.88 plus $9,404.52 of "impressed cash" of Agni belonging to the petitioner but which had been held by the purchasers. The $9,404.52 was not a part of the properties sold by the petitioner and was returned to it on January 6, 1930.

On November 22, 1930, the respondent requested the petitioner to execute and file Form 851—Affiliation Schedule for 1929. On December 1, 1930, the petitioner informed the respondent that the in-

formation requested by such form had been furnished to the revenue agent at the time he made the examination of the petitioner's 1929 return and further stated: "The status of all our Companies were the same except that the Agni Motor Fuel Company was out of the consolidation from September 30th, 1929."

In accordance with a suggestion or request from the petitioner, Agni, on March 15, 1930, filed a separate income tax return for itself for the period October 1 to December 31, 1929. This return, which was signed by R. T. Seidel as vice president and A. J. Hedlund as treasurer (both of whom were parties to the supplementary stipulation relative to the formal contract executed between the Globe Co. and the petitioner under date of January 15, 1930), contained the following statement:

*Explanation of Change in Stock Ownership*

Prior to October 1, 1929 all of the capital stock of this company was owned by the United States Industrial Alcohol Co., New York City. A consolidated return for this company was filed by the United States Industrial Alcohol Co. for 1928.

On October 1, 1929 all of the capital stock of this company was sold to the present owners.

The earnings of this company for the period from January 1, 1929 to September 30, 1929, inclusive, are being consolidated with the earnings of the United States Industrial Alcohol Co. for 1929. The accompanying return is for the period from October 1st to December 31, 1929, during which time the operations of the company inured to the benefit of its present owners.

In the consolidated return filed by petitioner and its subsidiaries for 1929 the gross income and deductions of Agni for only the first nine months of that year were included.

Pursuant to instructions from the petitioner, F. W. La Frentz & Co., certified public accountants, made an examination of the records and books of account of the petitioner and its subsidiary and controlled companies for the year 1929. In their report dated March 20, 1930, they stated that they had examined Agni's operations for the nine months ended September 30, 1929, and included the profit and loss accounts for that period. They however omitted a balance sheet for Agni as at December 31, 1929, and eliminated Agni's surplus as at September 30, 1929, from the consolidated report, stating as a reason for such action that the petitioner had sold the entire 500 shares of Agni's stock on September 30, 1929, when Agni ceased to be a subsidiary of the petitioner.

The petitioner did not report any profit from the sale of the Agni stock in either its consolidated income tax return for 1929 or that for 1930. On its return for 1930 the petitioner showed a net loss from all operations in that year of $2,790,658.17.

In determining the deficiency for 1929 the respondent determined the cost to the petitioner of the land and the Agni stock to be $40,000 and $50,000, respectively, subtracted the total of those amounts or $90,000 from $270,401.40 as the selling price, and added the remainder or $180,401.40 to the taxable net income of the petitioner as gain on the sale of the Agni stock. He now concedes that this amount is too large by $9,404.52, so that the amount of income actually in dispute is $170,996.88.

In determining the deficiency for 1929 the respondent determined the net income of the petitioner and each of its subsidiaries separately and then consolidated the respective amounts.

OPINION.

When petitioner's directors authorized the sale of "The Agni Motor Fuel Co." for its book value [22] and the vendee confirmed the transaction in writing with supporting schedules, the resulting profit was then taxable to one on the accrual basis as a fixed liability in an ascertainable amount. *Commissioner* v. *Union Pacific Railroad Co.*, 86 Fed. (2d) 637 (C. C. A., 2d Cir.); *Schoellkopf Aniline & Chemical Works* v. *United States*, 3 Fed. Supp. 417 (Ct. Cls.); *Helvering* v. *Nibley-Mimnaugh Lumber Co.*, 70 Fed. (2d) 843 (App. D. C.). Cf. *Edgar Stanton et al., Executors*, 34 B. T. A. 451, 459; affd., 98 Fed. (2d) 739 (C. C. A., 7th Cir.).

Without more this would suffice. But in addition the vendee "took operating charge" [23] and within the taxable year the exact price in dollars was determined and confirmed by the parties and the vendee offered to make a down payment of a substantial installment.[24] Certainly it would be an anomaly to describe the situation as it then existed as an unenforceable or even an executory arrangement. *Commissioner* v. *Union Pacific Railroad Co., supra*, 639. Cf. *Lucas* v. *North Texas Lumber Co.*, 281 U. S. 11.

That the parties themselves regarded the sale as a 1929 transaction is amply confirmed. The sale was made "as of September 30, 1929." Revenue stamps affixed to the certificates of stock bear a cancellation date in 1929. The Agni Motor Fuel Co. was eliminated from petitioner's consolidated return from September 30, 1929, on, and a separate return on behalf of the purchaser was filed for it for the balance of that year because from October 1 to December 31, 1929, "the operations of the company inured to the benefit of its present owners." This treatment was the result of petitioner's suggestion. The accountants employed by petitioner to audit its books reported

[22] See Minutes of Sept. 24, 1929, meeting set out in our findings.
[23] Tr. 615 and Exhibit 82.
[24] Exhibits 82, 83.

that the Fuel Co. was eliminated from petitioner's bookkeeping system as of September 30, 1929, because of the sale. The purchase price was carried on petitioner's books as a 1929 accrual. And, finally, interest was made payable by the vendee from September 30, 1929, and it retained profits from the business from that time, apparently, "because that date, September 30th, was the date at which we [petitioner] figured the—the assets to be turned over." [25] If "possession and the burdens and benefits of ownership" are the factors determining the time of sale, little doubt can remain that the sale here was accruable in 1929. *Nibley-Mimnaugh Lumber Co.*, 26 B. T. A. 978, 985; remanded *sub nom. Helvering* v. *Nibley-Mimnaugh Lumber Co.*, *supra; Fordyce* v. *Helvering*, 76 Fed. (2d) 431, 434 (App. D. C.).

We can not agree with petitioner that the statute of frauds intervened as an obstacle to the enforceability of the 1929 agreement. Not only was there "a note or memorandum" signed by the party to be charged long prior to the closing of the transaction in 1930, but the purchaser took possession of the Fuel Co. as a going business and apparently that, together with the real property [26] used by it, was the true subject of the sale.[27] The certificates of stock were mere evidences of the transfer of title comparable to the deeds of real estate, and "The delivery of a deed may be postponed and payment of part of the purchase price may be deferred by installment payments * * *." *Commissioner* v. *Union Pacific Railroad Co.*, *supra*, 639. Furthermore, the fact that the preliminary agreement was followed by a formal contract of transfer in the subsequent year and that some details of the transaction were afterwards changed is not sufficient to alter the result. *Schoellkopf Aniline & Chemical Works* v. *United States*, *supra*, 422. "* * * all that remained to be done thereafter related to the mechanics of the transfer." *Fordyce* v. *Helvering*, *supra*, 435.

It is true that petitioner did not return the income as a profit received in 1929, and it may be that a more difficult problem would be presented if petitioner had carried the profit on its books as a 1930 accrual and had returned it as income in the latter year. But this is a question we need not decide for, as has been said, the purchase price was accrued as of 1929 and no return of the profit was made for the year 1930 any more than for 1929. Such facts as appear with respect to the treatment accorded the transaction by petitioner are far from sufficient to justify us in concluding that error in respondent's determination, as now adjusted, has been affirmatively proved. It follows that petitioner's claim in this connection, except to the extent conceded by respondent, must be denied.

[25] Tr. 892.
[26] Respondent computed no profit on the real property.
[27] See footnote 26, *supra*.

## *Issue IV.—Losses on Disposition of Physical Assets.*

### FINDINGS OF FACT.

For the purpose of determining the annual allowance for depreciation, the various kinds of tangible property wherever situated owned by petitioner or its affiliates and used by it in its trade or business were divided by respondent into groups or classes as follows: Buildings, machinery, and equipment; tank cars; and trucks and autos. With respect to each group or class, in computing the annual allowance for depreciation for each of the years 1917 to 1929, both inclusive, composite rates deemed appropriate to each class or group, which contemplate the cost and expected useful life of each item of property included within that class or group, were used. In the final determination of income tax liabilities of petitioner and its subsidiaries for the years 1917 through 1927 the use of composite rates has been accepted by petitioner and respondent. The allowable deductions for depreciation used in the computations of net taxable income shown in the notices of deficiency herein involved were determined by the use of composite rates. For the years prior to 1924 depreciation was allowed on autos and trucks as a separate classification. For the year 1924 and subsequent years, including 1928 and 1929, autos and trucks were included in the "machinery and equipment" classification. The composite rates thus used for each of said years in computing the annual depreciation allowable to petitioner and its affiliates, the U. S. Industrial Chemical Co. and U. S. Industrial Alcohol Co. (California), with respect to machinery and equipment and buildings and tank cars are set forth in Annex 7, which forms part of the stipulation of facts.

In the consolidated income tax returns for 1928 and 1929 the petitioner and its affiliates, the U. S. Industrial Chemical Co. and U. S. Industrial Alcohol Co. (California), deducted losses with respect to certain properties set out in annexes forming part of the stipulation of facts. Such losses are as follows:

(a) A loss of $4,387.22 taken by the petitioner in 1928 as sustained on the scrapping or sale of 60 items of machinery and equipment set out in Annex 8 and acquired by the petitioner during the years 1917 through 1925 at a total cost of $25,971.88. In no taxable year subsequent to 1927 has the respondent made any allowance for exhaustion, wear and tear or obsolescence of said machinery and equipment. Of said 60 items, 13 were secondhand at the time of acquisition by the petitioner, having been installed by a predecessor owner in the years ranging from 1907 to 1918.

(b) A loss of $13,462.73 taken in 1928 by the U. S. Industrial Chemical Co., as sustained on the scrapping or sale of 190 items of

buildings, machinery, and equipment set out in Annex 9 and acquired during the years 1917 [28] through 1928 at a total cost of $32,088.87. In no taxable year subsequent to 1927 has the respondent made any allowance for exhaustion, wear and tear, or obsolescence of the buildings, machinery, or equipment. Of said 190 items at least 30 were secondhand at the time of acquisition by the U. S. Industrial Chemical Co., having been installed by a predecessor owner in the years 1915 and 1916.

(c) A loss of $12,467.35 taken in 1929 by the petitioner as sustained on the scrapping or sale of 185 items of miscellaneous property ranging from office furniture and fixtures to 50-ton tank cars, some of the latter being constructed of wood and some of steel, set out in Annex 10, which were acquired by the petitioner during the years 1917 through 1928 at a total cost of $91,293.44. With the exception of the tank cars, no allowance for any taxable year subsequent to 1928 has been made by respondent for exhaustion, wear and tear, or obsolescence in said 185 items of miscellaneous property. With respect to the tank cars the respondent has made allowances for exhaustion, wear and tear, and obsolescence at the composite rates for tank cars for all years from the date of acquisition through 1929. Of said 185 items, 16 were secondhand at the time of acquisition by the petitioner, 2 having been installed by a predecessor owner in 1917 and the remainder at some undisclosed time prior to 1918.

(d) A loss of $5,048.18 taken in 1929 by the U. S. Industrial Chemical Co. as sustained on account of the scrapping or sale of 54 items of miscellaneous property ranging from a bicycle to a dust settling hopper, set out in Annex 11, which were acquired by the company during the years 1917 [29] through 1928 at a total cost of $15,307.30. The respondent has made allowances for exhaustion, wear and tear, and obsolescence of said property at the composite rates for machinery and equipment for all years from the date of acquisition by the company through 1929. Of said 54 items at least 3 were secondhand at the time of acquisition by the company, one having been installed by a predecessor owner in 1917 and the other two in 1920.

Respecting the properties on which the losses set out in paragraphs (a) through (d), *supra*, were claimed, many of them were sold; some were abandoned because of insufficient water supply; some were traded in for new property; some were charged out of the property

---

[28] Although it is stated in Annex 9 that one of the items was acquired by that company in 1916, the parties have stipulated that the U. S. Industrial Chemical Co. was incorporated on November 19, 1917.

[29] It is stated in Annex 10 that 24 of the items were acquired by the U. S. Industrial Chemical Co. in 1915 and 1916. See footnote 28, *supra*.

account on the books because it was found that such items could not be located or were unaccounted for or otherwise had been lost, but the year when such items were actually lost has not been disclosed; some items were charged out of the property account because they were observed to be on the scrap or junk pile, but the year in which they were placed there has not been disclosed; some items were stolen, but the year of theft has not been disclosed; some items (tank cars) were destroyed in a railroad wreck which occurred in 1919, and some were sold during 1920; some items covered by a blanket policy of insurance were destroyed by fire; however, no showing has been made as to the amount of recovery with respect thereto; many items were demolished, dismantled, junked, scrapped, or abandoned in the respective taxable years because they either were worn out or had been broken beyond repair, but as to which no showing has been made as between items that were worn out and those that had been broken, the chief engineer of the petitioner and its affiliates considering that there was no distinction between the two classes of items and the petitioner and its affiliates employing no established rule for recording such items as falling in one class or in the other.

(e) A loss of $25,445.86 taken in 1929 by the U. S. Industrial Alcohol Co. (California) as sustained on account of the sale of 22 items of machinery and equipment, set out in Annex 12, which were acquired by that company in 1926 and 1927 at a total cost of $30,-029.15. The respondent has made allowances for exhaustion, wear and tear, and obsolescence of said machinery and equipment at the composite rates for machinery and equipment for all years from the date of acquisition by the company to July 1, 1929, the allowance for the first half of 1929 being $2,035.13. Of said 22 items of machinery and equipment, 21 were secondhand at the time of acquisition by the company, 20 having been installed by a predecessor owner in 1923 and one in 1917.

During the respective years for which losses are claimed as shown in paragraphs (a) through (e) above, all the items of property set out in Annexes 8 through 12 were charged out of the property accounts on the books of the petitioner (or its respective affiliate, as the case may be) and the property cards therefor were canceled. The full amount of the deductions taken, as set out in paragraphs (a) through (e) above, was disallowed by the respondent except as to that involved in paragraph (c). Of that deduction of $12,467.35, the respondent, due to an erroneous statement in a revenue agent's report, mistakenly determined that only $10,018.82 had been deducted in the return and accordingly disallowed to the extent of only $10,018.82 the amount actually deducted.

In explanation of his denial of the above mentioned losses the respondent made the following statement in the deficiency notices:

The loss claimed on equipment (assets in the 1929 notice) sold or scrapped during the taxable year has not been allowed for the reason it appears the rate of depreciation allowed is based on the average lives of the assets in the account and that profit or loss on normal retirements cannot be determined until all assets contained in the account have been retired. References: T. D. 4422 and Mimeograph 4170, Cumulative Bulletin XIII–1, June 1934, pages 58 and 59.

Of the claimed losses described in the preceding paragraph, petitioner or its respective affiliates, as the case may be, sustained losses in the respective years, and upon the abnormal retirement of the assets, indicated in the following table, and is entitled to deductions therefor computed by using the respective rates of depreciation there shown and the cost and sale or salvage values stipulated by the parties:

| Item No. | Asset | Year acquired | Depreciation allowed per year |
|---|---|---|---|
| | *Annex 8, year 1928, par. (a) above* | | *Percent* |
| 15 | Machinery and equipment | 1919 | $9\frac{1}{11}$ |
| 31 | Do | 1923 | $14\frac{4}{5}$ |
| 46 | Do | 1919 | $9\frac{1}{11}$ |
| | *Annex 9, year 1928, par. (b) above* | | |
| 125–127 | Machinery and equipment | 1924 | $16\frac{2}{3}$ |
| 169 | Horse | 1926 | 25 |
| | *Annex 10, year 1929, par. (c) above* | | |
| 2 | Machinery and equipment | 1921 | 10 |
| 82 | do | 1927 | 25 |
| 98 | do | 1921 | 10 |
| 171–181 | Wooden tank cars | 1918 | $7\frac{9}{13}$ |
| | | 1922 | $11\frac{1}{6}$ |
| | | 1923 | $12\frac{1}{2}$ |
| | *Annex 11, year 1929, par. (d) above* | | |
| 14 | Machinery and equipment | 1924 | $14\frac{4}{5}$ |
| 28–30 | do | 1920 | $9\frac{1}{11}$ |
| | *Annex 12, year 1929, par. (e) above* | | |
| 1–13 | Machinery and equipment | 1926 | 20 |
| 14–22 | do | 1927 | 25 |

In addition to losses on the above indicated assets the petitioner or the U. S. Industrial Chemical Co., as the case may be, sustained losses in the respective years upon the abnormal retirement of the following assets, all of which were acquired in 1918 or prior thereto, and is entitled to deductions therefor computed by using the composite rates applied in the respective years and the cost and sale or salvage values stipulated by the parties:

| Item No. | Asset<br>Annex 8, year 1928, par.<br>(a) above |
|---|---|
| 19 | Machinery and Equipment |
| 27–30 | do |
| 32–35 | do |
| 39–41 | do |
| 59 | do |
| | Annex 9, year 1928, par.<br>(b) above |
| 1 | Building |
| | Annex 10, year 1929, par.<br>(c) above |
| 80, 81 | Machinery and Equipment |
| | Annex 11, year 1929, par.<br>(d) above |
| 12 | Machinery and Equipment |

The losses sustained with respect to the items in the respective annexes as set out in the two tables above are to be reduced to the extent of any gains realized on the disposition of other items in the respective annexes, in accordance with petitioner's concession.

By amended petitions the petitioner now seeks the deduction of certain losses, not taken in the consolidated returns for 1928 and 1929, with respect to certain properties set out in annexes which form part of the stipulation of facts. Such losses are as follows:

(f) A loss of $59,719.69 as sustained by the petitioner in 1928 on account of abandonment of 16 items of machinery and equipment set out in Annex 13, sometimes referred to as Alcogas and Curtis Bay equipment, acquired by the petitioner during the years 1918 through 1922 at a total cost of $96,677.37. None of said items was charged out of the property account on the petitioner's books until December 31, 1931, when 10 items, whose cost was about 62 percent of the total cost of the 16 items, were written off. The property cards for the remainder of the items were canceled during the years 1934 to 1937, inclusive. In determining the deficiency for 1928 the respondent did not allow any amount as a deduction for a loss with respect to any of said 16 items. The respondent, however, has made allowances for exhaustion, wear and tear, and obsolescence of said machinery and equipment at the composite rates for machinery and equipment for all years from the date of acquisition by the petitioner through 1929.

(g) A loss of $77,424.55 as sustained by the U. S. Industrial Chemical Co. in 1928 on account of abandonment of 42 items of machinery and equipment set out in Annex 14, which were acquired by the company during the years 1919 through 1926 at a total cost of $110,070.71. None of said items was charged out of the property account on the books of the company until December 31, 1931, when

they were all written off. In determining the deficiency for 1928 the respondent did not allow any amount as a deduction for a loss with respect to any of said 16 items. The respondent has made allowances for exhaustion, wear and tear, and obsolescence of said machinery and equipment at the composite rates for machinery and equipment for all years from the date of acquisition by the company through 1929.

The properties on which the losses set out in paragraphs (f) and (g), *supra*, are claimed were the subject in part of a special report styled "Proposed 1928 write-off," dated November 12, 1928, and made by John E. Bernard, chief engineer of the petitioner and its subsidiaries, to Brown, the petitioner's president. The report contains the following:

In accordance with your request I am sending herewith a detailed list of property items that may be written off in accordance with your desires.

This list was gotten up at the request of Mr. Watkins [the petitioner's auditor] and was compiled mainly with the idea of showing physical equipment at the various plants that is not in actual use and has no actual value in present operations.

\*     \*     \*     \*     \*     \*     \*

The purpose in mind, when this list of values was made up was to enable you to make any selection you wish, consistent with the desired total amount you may have in mind. It is not our intention that the entire amount should be written off but we made the list comprehensive to give you an idea of the maximum amount that would be in order.

The total cost shown in Barnard's report of the items listed therein with respect to the petitioner's Alcogas division was $78,600.30, and the Curtis Bay division was $66,097.47. The total cost shown in the report of the items listed therein with respect to the U. S. Industrial Chemical Co. was $192,459.33.

The petitioner's president, Brown, who Bernard's report indicates was the official responsible for determining what property should be abandoned and when it should be abandoned and written off the books, did not decide that the properties on which the losses set out in paragraphs (f) and (g), *supra*, are claimed should be abandoned and written off in 1928. Said properties were not abandoned in 1928.

(h) A loss of $89,983.03 as sustained by the petitioner in 1928 or in 1929 on account of abandonment of 161 items of machinery and equipment set out in Annex 16 and comprising the major items if not all of the machinery and equipment at the petitioner's Louisiana Distillery (sometimes referred to as Distillery No. 3 and also the Louisiana plant) located at New Orleans. By far the greater part of this machinery and equipment was acquired by the petitioner on December 1, 1917 (with certain buildings referred to in the fol-

lowing paragraph) from a predecessor owner who had acquired it during the years 1902 to 1917, inclusive. The remainder of the machinery and equipment was acquired by the petitioner during the years 1918 through 1926. The total cost to the petitioner of said 161 items of machinery and equipment was $333,868.70. None of the items were charged out of the property account on the petitioner's books until December 31, 1931, when all of them were charged off. In determining the deficiencies for 1928 and 1929 the respondent did not allow any amount in either year as a deduction for a loss with respect to any of said 161 items. The respondent has made allowances for exhaustion, wear and tear, and obsolescence of said machinery and equipment at the composite rates for machinery and equipment for all years from the date of acquisition by the petitioner through 1929.

(i) A loss of $47,898.30 as sustained by the petitioner in 1928 or in 1929 on account of abandonment of 21 buildings (or loss on account of change in use to which the buildings were put or allowance on account of accelerated depreciation thereon) set out in Annex 17, which comprised the buildings at the petitioner's Louisiana distillery. Twenty of the buildings were acquired by the petitioner on December 1, 1917, at a total cost of $76,579.71 and in 1920 the petitioner constructed the other at a cost of $2,207.91, making a total cost of $78,787.62 for all the buildings. Of the buildings acquired by the petitioner in 1917, one was constructed by a predecessor owner or owners in 1870, one in 1890, 7 in 1904, one in 1908, 6 in 1913, one in 1914, 2 in 1915, and one in 1917. The record does not indicate when, if ever, these buildings, or any part of the cost of any of them, were charged out of the property account on the petitioner's books. In determining the deficiencies for 1928 and 1929 the respondent did not allow any amount in either year as a deduction for a loss with respect to any of said buildings. The respondent has made allowances for exhaustion, wear and tear, and obsolescence of the buildings at the composite rates for buildings for all years from the date of acquisition by the petitioner through 1929.

Prior to December 1927 the petitioner, by the use of the buildings, machinery, and equipment referred to in the preceding two paragraphs, conducted three classes of operations at the Louisiana distillery, namely, the distilling of alcohol, the denaturing of alcohol, and the operation of a bonded warehouse, the buildings, machinery, and equipment used in such operations being designated the distilling plant, the denaturing plant, and the bonded warehouse, respectively. On December 23, 1927, the petitioner advised the prohibition administrator at New Orleans by letter that it desired to suspend the production of alcohol at its Louisiana distillery for an extended period, but

desired to continue operations in the bonded warehouse and in the denaturing plant. This letter bore the certification of the "U. S. Storekeeper Gauger In Charge" that the valves in the pipes that convey steam to the stills had been securely locked so as to prevent further distillation. Operation of the distillery was suspended in 1927 because the use of its productive capacity was not required at that time and because other plants of the petitioner were better suited and better located for economical production. No distilling operations were thereafter conducted at the Louisiana distillery and after 1928 no denaturing operations were carried on.

The records of the prohibition administrator at New Orleans show that about August 15, 1928, two molasses measuring tanks were increased in size and a redistill kettle was replaced with one of larger capacity and that all the fermenting tanks were recalibrated, due to repairs made in the wooden staves. On or about October 5, 1928, there was filed with the prohibition administrator at New Orleans a bond executed by the petitioner and the Hartford Accident & Indemnity Co. on September 28, 1928, to cover the operation by the petitioner at its Louisiana distillery of an industrial alcohol plant, a bonded warehouse, and a denaturing plant. This bond continued in force until canceled as of April 1, 1930.

Under date of July 28, 1927, the petitioner made application for a renewal permit to operate its Louisiana distillery for the calendar year 1928. Under dates of August 15 and November 27, 1928, it made application for a permit to operate an industrial alcohol plant, bonded warehouse, and denaturing plant at the Louisiana distillery for the calendar year 1929. Under date of October 1, 1929, a like application for a permit for the calendar year 1930 was made. The latter application was filed because business was good in 1929, and the petitioner hoped it would continue and wanted to be ready in case there should be need for the operation of the plant. Permits were issued which authorized production at the Louisiana distillery of 8,355,000 proof gallons in 1928, 1,472,063 proof gallons in 1929, and zero proof gallons in 1930. The quantity permitted to be produced during any calendar year could be amended to permit an increase in amount by a proper showing of facts by the producer. The production authorized for 1929 was, in May of that year, redistributed to other plants upon request of the petitioner.

By the end of July 1928 all of the alcohol which had been produced at the Louisiana distillery and was in storage there when distilling operations were suspended in December 1927 had been removed. Beginning in November 1928, the bonded warehouse was used for the storage of alcohol which was brought from the petitioner's International plant at New Orleans. Thereafter, alcohol was stored con-

tinuously at the Louisiana distillery until the end of March 1930, and reached a maximum quantity of 830,393 proof gallons in November 1929. The petitioner's permit to conduct operations at the Louisiana distillery was canceled as to all transactions after March 31, 1930, and the supporting bond was canceled as to all transactions after April 1, 1930.

On September 24, 1932, the petitioner leased 9 of the buildings at the Louisiana distillery for a period of one year from October 1, 1932, at a rental of $600 a month, for use as a cotton storage warehouse. The cost to the petitioner of the 9 buildings was $38,519.46. Under the terms of the lease the lessor was to pay all taxes and insurance on the buildings and on the property of the petitioner contained therein. On October 15, 1935, the petitioner leased the buildings for a period of one month from that date at a monthly rental of $300 and to continue in effect from month to month until terminated by either of the parties on 60 days' notice. Under the terms of the lease the lessor was to pay all taxes and insurance on the buildings and on the property of the petitioner contained therein.

The Louisiana distillery was covered by insurance at all times and the property taxes thereon amounted to about $3,000 a year.

The properties on which the losses set out in paragraphs (h) and (i), *supra*, are claimed were not abandoned by the petitioner in either 1928 or 1929.

(j) A loss of $139,916.78 as sustained by the U. S. Industrial Chemical Co. in 1929 on account of abandonment of a building and 63 items of machinery and equipment set out in Annex 15, sometimes referred to as ammonia sulphate building and equipment and Cottrell precipitator, acquired by the company during the years 1918 through 1926 at a total cost of $220,568.58. In determining the deficiency for 1929 the respondent did not allow any amount as a deduction for a loss with respect to the building or any of said 63 items of machinery and equipment. Respondent, however, has made allowances for exhaustion, wear and tear, and obsolescence of the building at the composite rates for buildings for all years from the date of acquisition by the company through 1929 and has made allowances for exhaustion, wear and tear, and obsolescence of the 63 items of machinery and equipment at the composite rates for machinery and equipment for all years from the date of acquisition by the company through 1929.

For the purpose of recovering byproducts from the manufacture of alcohol, the U. S. Industrial Chemical Co., during 1924, 1925, and 1926, installed certain machines and certain equipment employed in their use, all of which as a unit was designated the Cottrell precipitator, and which sometimes hereinafter is referred to as the precipitator. The precipitator constituted 12 and a part of another (engineering

fees) of said 63 items of machinery and equipment set out in Annex 15. The use of the precipitator caused a reduction in its capacity and a depreciation of its condition. The precipitator had not operated in an entirely successful manner and about November 1929 its operation was discontinued as unsatisfactory and with an intention of not resuming it again. Thereupon the company began dismantling and removing the precipitator to make way for the installation of new equipment known as the Dracco system, which replaced it in use. The installation of the last units of the Dracco system was completed some time in 1930. Although the precipitator had been dismantled and removed by the end of 1929, the items composing it were not then disposed of and none of the items were charged out of the property account on the books of the company until November 30, 1930, when 12 were written off, and it was not until December 31, 1931, that part of another (engineering fees) was written off. The following is a statement of the items comprising the precipitator (the items being numbered as in Annex 15), the year of acquisition by the company, the cost to the company, the normal useful life in years, year of normal retirement, total depreciation accrued at the composite rate allowed by the respondent through 1929, total depreciation accrued through 1929 based upon normal useful life of each item, and estimated sale or salvage value at the end of 1929:

| Reference No. | Item | Yr. of acqsn. | Cost | Normal life | Yr. of normal retirement | Deprn., composite rate | Deprn., based on normal life | Sale or salvage value |
|---|---|---|---|---|---|---|---|---|
| 52 | (Part of) engineering fees (consulting; Cottrell precipitating machines) | 1925 | $3,117.45 | 5 | 1930 | $1,126.18 | $2,805.71 | -------- |
| 53 | _____do_____ | 1924 | 54,433.93 | 5 | 1929 | 23,202.46 | 54,433.93 | -------- |
|  | _____do_____ | 1925 | 3,867.73 | 5 | 1930 | 1,426.23 | 3,480.96 | -------- |
|  | _____do_____ | 1926 | 6,155.13 | 5 | 1931 | 1,877.31 | 4,308.59 | -------- |
| 54 | Substation installation | 1924 | 1,044.00 | 10 | 1934 | 445.01 | 574.20 | $25.00 |
| 55 | Switchboard | 1924 | 1,844.44 | 10 | 1934 | 786.19 | 1,014.44 | 50.00 |
| 56 | Motor | 1924 | 138.00 | 10 | 1934 | 58.82 | 75.90 | -------- |
| 57 | Motor | 1924 | 138.00 | 10 | 1934 | 58.82 | 75.90 | -------- |
| 58 | Motor | 1924 | 138.00 | 10 | 1934 | 58.82 | 75.90 | -------- |
| 59 | Rectifyer | 1924 | 387.00 | 10 | 1934 | 164.96 | 212.85 | -------- |
| 60 | Rectifyer | 1924 | 387.00 | 10 | 1934 | 164.96 | 212.85 | -------- |
| 61 | Rectifyer | 1924 | 387.00 | 10 | 1934 | 164.96 | 212.85 | -------- |
| 62 | Transformer | 1924 | 990.00 | 10 | 1934 | 421.99 | 544.50 | -------- |
| 63 | Transformer | 1924 | 990.00 | 10 | 1934 | 421.99 | 544.50 | -------- |
| 64 | Transformer | 1926 | 1,017.42 | 10 | 1936 | 310.31 | 356.09 | -------- |
|  | Total | -------- | 75,035.10 | -------- | -------- | 30,689.01 | 68,929.17 | 75.00 |

In 1929 the company sustained a deductible loss of $6,030.93 (cost of $75,035.10, less accrued depreciation of $68,929.17 based on normal useful life, less sale or salvage value of $75) on the abandonment and dismantling of the Cottrell precipitator.

The combustion gases that were passed into the Cottrell precipitator contained small quantities of ammonia gas. For the purpose of housing machinery and equipment to manufacture ammonia sulphate from

the combustion gases after they passed from the Cottrell precipitator, the petitioner in 1924 erected, next to the building in which the Cottrell precipitator was housed, a 3-story structural steel building with tile walls and a 1-story annex thereto, the annex being separated from the 3-story portion by a partition wall. The 3-story building and annex are set out as item 1 in Annex 15, *supra*. A conveyance was provided for conducting the gases directly from the Cottrell precipitator into the ammonia sulphate machinery and equipment installed in the new building. Since 1929 the annex portion of the building has been used more or less continuously for the storage of the product produced by the Dracco system and no loss is claimed in these proceedings with respect to this portion of the building. The cost of the 3-story portion of the building used to house the machinery and equipment used in the production of ammonia sulphate was $46,808.21, or three-fourths of the total cost of this portion and the annex. The 3-story portion of the building was not abandoned in 1929. Until 1934 it continued to house ammonia sulphate machinery and equipment. After that it was used for some undisclosed period for the storage of drums and at another time it was used for a few weeks for experimental purposes. In 1937 a new roof was put on this portion of the building and the walls were repaired. No part of the cost of the building has ever been written out of the property account on the books of the company. The value in 1929 of this portion of the building for storage purposes was 25 percent of its cost. The normal useful life of the building was 30 years from the date of its construction.

The machinery and equipment housed in the above mentioned building, which is sometimes hereafter referred to as the ammonia sulphate machinery and equipment, being items 2 through 51 and part of item 52 shown in Annex 15, *supra*, was acquired by the company during the years 1918 through 1926, principally 1924 and 1925, at a total cost of $98,725.27. With the shutting down of the Cottrell precipitator in November 1929, the company shut down the operation of the ammonia sulphate machinery and equipment and its operation was never resumed. Such machinery and equipment was in operating condition and was equally as well adapted for use in connection with the Dracco system as with the Cottrell precipitator. In 1928 the company's production of ammonia sulphate amounted to about 2,000 tons and in 1929 amounted to about 1,300 or 1,400 tons. In 1928 the selling price of ammonia sulphate was about $2 a unit, in the fall of 1929 it was about $1.50, it dropped below $1 in 1930, and it steadily declined thereafter for several years. The reason why the company shut down the operation of the ammonia sulphate machinery and equipment in November 1929 and did not resume operation was that

the price of ammonia sulphate had declined to the point where it was unprofitable for the company to continue the operation. In installing the Dracco system in the building formerly occupied by the Cottrell precipitator a side or secondary stack was installed for conducting and passing off the gases from the Dracco system instead of providing for their passage through the conveyance formerly in use for conducting them directly from the Cottrell precipitator into the ammonia sulphate machinery and equipment. None of the ammonia sulphate machinery and equipment was charged out of the property account on the books of the company until December 31, 1931, when all of it was written off. Prior to 1934 none of it was removed from the building which housed it and in that year the greater portion of it was demolished and scrapped. Some parts of it were stored, some transferred to another plant, and some were not scrapped or junked until 1937. The ammonia sulphate building, machinery and equipment were not abandoned in 1929.

OPINION.

This issue involves losses claimed by petitioner as deductions upon the retirement of hundreds of items of property on which, together with a much larger number of other items, depreciation at composite rates has been allowed by the respondent as set out in our findings of fact. Petitioner's position appears to be that upon any retirement it is entitled to deduct a loss after allowing for depreciation computed at the composite rate. Respondent, on the other hand, contends that petitioner was under the duty of furnishing evidence as to the actual anticipated life of each item of property and was limited to such losses, if any, as result from a computation based upon the actual rather than the composite depreciation applicable to that item. In our view the correct principle lies somewhere between.

A composite rate may be arrived at by taking average depreciation based upon the anticipated life of the assets concerned, weighted for their respective costs. The resulting rate is then applied to the entire group of assets involved.[30] This method of computation produces a convenient rule of thumb for calculating depreciation on a large number of assets, and if properly applied minimizes the possibility of double deductions. The latter requisite must constantly be adhered to in the application of methods of depreciation. *Illinois Pipe Line Co.*, 37 B. T. A. 1070, 1081.

Under this theory of a composite rate it is proper to eliminate from the base the cost of assets as they arrive at the end of their

[30] See I. T. 2838 XIII, 2 C. B. 133, 135: " * * * In such cases, however, accurate results can be obtained through the application of depreciation rates based on weighted average lives * * *." See also Mim. 4170 XIII, 1 C. B. 59, 61; T. D. 4612 XIV, 2 C. B. 99.

useful lives. This results from the fact that the composite rate is an average and that some assets will actually have a shorter and some a longer period of existence than the useful life appropriate to that average. Only if the base is constantly reduced by the cost of the assets removed from it as they reach the end of their anticipated useful life will it be possible for the owner to continue to take depreciation deductions beyond the median point and while some of the longer lived assets are still necessarily being usefully employed.

A simple illustration will suffice. Assume five assets, each of the same cost basis, having anticipated useful lives of one through five years. The average life will be three years. On the theory that this calls for a depreciation rate of 33⅓ percent,[31] that is also the weighted average since the costs are identical. Depreciation taken on the full original cost basis would exhaust the total investment at the end of three years and no depreciation would be allowable after that time, even though some of the assets would, by hypothesis, remain in use during the fourth and fifth years. Thus, for almost half the time the taxpayer would be deprived of an annual deduction for depreciation. If, however, the cost basis is reduced each year as one of the assets is removed from the group by reason of normal retirement, and, assuming no replacements, the gradually diminishing base and hence the reduced amount of depreciation will enable the taxpayer to continue to depreciate the assets remaining in each year at the composite rate throughout the fifth year and the result will be an exact recovery at that time of the original cost of all the assets.[32] It follows that, if an asset forming part of a group subject to a composite depreciation rate is retired because it has reached the end of its normal life, only its elimination as the cause of additional deductions will avoid unnecessarily premature depreciation on the one hand or double deduction on the other.

The foregoing discussion has been based on the assumption that the proper rate of depreciation is 33⅓ percent. If, however, the composite rate is arrived at by a weighted average not of the life expectancy of the assets in the group, but of the depreciation rates computed by the use of such life expectancies, the composite rate thus arrived at in the example given is 45⅔ percent rather than 33⅓. In the event that none of the assets are replaced, this results in somewhat premature depreciation, even calculated on a gradually dimin-

---

[31] This may be a slight oversimplification, as appears from the subsequent discussion.

[32] If, for example, each asset had cost $10, the basis would be reduced by that amount as one asset was retired each year, and the depreciation at the composite rate would be calculated on this gradually diminishing base. Thus, in the first year 33⅓ percent of the total cost of $50, or $16.67 would be deducted; in the second year, 33⅓ percent of $40, or $13.33, in the third $10, in the fourth $6.67 and in the fifth $3.33. It will be observed that at the end of the fifth year exactly $50, the original cost, will have been recovered through the total of such deductions.

ishing base, and in the example given the assets would be depreciated in full sooner than at the end of the useful life of the longest lived asset. But the more frequent situation is one where assets are replaced upon their retirement. Assuming this, and assuming that in each case they can be replaced at the same cost as that of the original asset, it will be found that depreciation computed at such a composite rate upon a basis currently maintained by eliminating assets normally retired and adding replacements, permits the renewal of each asset as it is retired without exceeding the depreciation reserve and that as the various annual cycles are completed the cost will be exactly recovered.[33] What has been said with respect to the necessity of removing normally retired assets without further compensation is equally true of the composite rate so calculated.

Even stronger reasons require that there be no excessive compensation by permitting loss deductions upon normal retirements. Since the composite rate assumes that some assets will be retired before, and some after the average, those reaching the end of their expected life, whether before or after the average, do not result in any loss. And to permit any to be taken would tend to cause double deduction even more certainly than would the failure to reduce the base. The following statement in *Illinois Pipe Line Co.*, *supra*, may at first glance appear to indicate the contrary: "However, if the basis is reduced as assets are retired, the entire cost of the assets can not be recovered unless the depreciated cost of the retired assets is allowed as a deduction at the time of their retirement." This statement was undoubtedly correct as applied to the facts in that case. The 5 percent rate used there was arrived at by assuming a 20-year life for all of the assets. It was the result of an anticipated destruction at the end of 20 years of the oil fields which were being served by the pipe line. It is evident that none of the assets under those circumstances could have had a useful economic life longer than 20 years, and, since the rate adopted was 5 percent, assets having a shorter life than 20 years would be retired at a loss. Thus the depreciation there, and the deductions, being calculated upon the maximum economic life of the entire plant, not the average life of separate assets, the loss deduc-

---

[33] Proceeding from the same example, we find that at the end of a 5-year cycle the asset having an expected life of one year will theoretically have been replaced four times, the second asset one and one-half times, the third asset two-thirds times, the fourth asset one-fourth time and the fifth asset will be on the point of retirement. A computation will show that at that point depreciation based upon the composite rate of 45% percent will have exactly equaled the original investment, together with additional expenditures necessitated by the replacement of assets normally retired, so that if at that moment the taxpayer were to go out of business, his total investment would be susceptible of recoupment in full by means of the aggregate of depreciation deductions and presumptive salvage value. At the end of a 60-year cycle the same is true, but without taking into account any salvage, since at that time the entire group would be at the point of replacement.

**1378**

tion was proper.[34] If, however, some of the assets had had an antici-
pated life of 30 years and some of 10, it is evident that depreciation
at the 5 percent rate over the longer period would cover the original
cost and that compensation by way of a deduction for losses on retire-
ment would be unnecessary, even though at the same time a continual
diminution of the cost basis of the entire property was spread over
a longer period than 20 years to prevent premature or excessive
depreciation. The statement quoted, therefore, while expressing the
rule applying to the facts in that case, is not to be considered as
applicable to a case where a composite rate is arrived at by averaging
rates appropriate to anticipated lives of varying lengths.

That the latter is the situation in the present proceeding appears
not only from the characteristics of a composite rate as defined in re-
spondent's rulings,[35] and from the express language of the facts here
stipulated to be true by both parties,[36] but from the deficiency notices,
the prima facie correctness of which has not been overcome by any
evidence to the contrary. Intimations in records admitted in evidence
for a restricted purpose that the rate finally adopted was the result of
an agreement of the parties after the inevitable give and take of com-
promise, do not derogate from this conclusion. We shall assume,
contrary to the facts, that the evidence was admitted without restric-
tion and could have been construed as petitioner would have it without
contradicting the stipulation. Even so, it indicates nothing more than
that two figures severally arrived at by the parties were reconciled
in conference. It does not even infer that these two figures were not
in the first instance the result of computations appropriate to the
described characteristics of the composite rate. And if they were, the
rate accepted by the parties would still have had those primary
characteristics.

The principle to be applied to a composite rate in such a case as
this, therefore, is that assets which are retired at the end of their normal
life can not be permitted to furnish further compensation by way of a
deduction for loss on retirement, even though they may be retired in
advance of the average life of the entire group. Their early retire-
ment will be compensated for by depreciation taken after the average
period has passed.

What has been said, however, applies only to normal retirements;
and the converse of the statement is also true. If assets are removed

---

[34] See Mim. 4170, XIII, 1 C. B. 59, 62: "In * * * classified accounts where it is
the consistent practice of the taxpayer to base the rate of depreciation on the expected
life of the longest-lived asset contained in the account, the loss upon retirement of an
asset is allowable."

[35] See footnote 30, *supra*.

[36] The stipulation recites (par. 18): "* * * composite rates deemed appropriate
to each class or group which contemplate the cost and expected useful life of each item
of property included within that class or group were used. * * *."

from the group as a result of abnormal retirements resulting from unanticipated causes occurring before the end of the normal life attributed to such assets in arriving at the composite rate, the resulting loss is the proper ground for a deduction. Such losses are not to be compensated for by way of depreciation, *Southland Coal Co.*, 16 B. T. A. 50, and if not permitted as deductions will prevent the final recovery of the entire original cost.

The petitioner here has shown that in some instances the retirements for which it claims deductions were abnormal or unusual in that they consisted of sales, and abandonment due to extraordinary obsolescence. Such a fact is inconsistent with the assumption that these assets had arrived at the end of the anticipated useful life which, for purposes of calculating the composite rate, was presumably attributed to them. The petitioner has hereby established a prima facie showing within the language of respondent's mimeograph 4170,[37] "that assets are disposed of before the expiration of the normal expected life thereof, as for example, because of  *  *  *  obsolescence other than normal, or sale", and has thus produced evidence that "losses on the retirement of such assets may be allowed." If the fact nevertheless was that such dispositions were coincident with the termination of the normal anticipated life of the assets, the burden was upon the respondent to show it in rebuttal of petitioner's evidence, thereby sustaining his burden of going forward to refute the prima facie case established by petitioner. Except in one instance, which will be further referred to, he has not met that burden. The very fact that he has assumed the burden in some situations justifies the inference that it would not have been unbearable in the others.

Assuming, therefore, that petitioner has shown that the retirement in question took place in advance of the termination of the life of the asset on the basis of which depreciation was computed, only the allowance of the loss suffered thereby will enable petitioner to recover its full cost. *Illinois Pipe Line Co., supra.* The question of the amount of the loss to be deducted still remains for consideration.

The cost of the asset and the sale or salvage value thereof has in each case been stipulated. If these were the only factors, calculation of the loss would be a simple matter. What remains to be computed is the amount by which "the basis shall be diminished" by reason of "the deductions for exhaustion, wear and tear  *  *  *  which have since the acquisition of the property been allowable in respect of such property  *  *  *."[38] Petitioner again contends that this amount is to be computed at the composite rate; respondent that it should be at the rate appropriate to the normal life assumed for the assets

---

[37] See footnote 34, *supra*.
[38] Revenue Act of 1928, sec. 111 (b).

1380

in determining the composite rate. He further contends that, since no evidence of the latter has been furnished by the petitioner, it has failed to sustain the burden of proving an essential fact and for this reason all deductions should be disallowed.

From what has been said and from all that we know of the petitioner's system of accounting, we can not say that the first contention of the respondent is incorrect and that the amount of loss suffered upon the abnormal retirement of a single asset is not to be measured by the value of the remaining life of that asset. This not only appears to be the true measure of petitioner's loss but is also the amount by which the total deductions computed at the composite rate will fall short of returning to it the original investment. Thus, if an asset having an anticipated life of two years is retired at the end of one, it seems obvious that the owner's loss is proportionately less than if an asset is retired at the same time which had an anticipated life of 10 years. The method by which the loss in a given individual situation is to be adjusted to the actual circumstances is, of course, by deducting the proper amount of depreciation theretofore sustained—or "allowable"—on the asset concerned, which is merely another way of saying that the loss to be compensated for is the remaining undepreciated cost of that particular asset. Since we are by definition in all these instances dealing with assets abnormally retired, it is only chance which determines whether they happen to be long or short-lived assets. Computing a taxpayer's loss by using depreciation at the composite rate will leave to the same chance the decision of whether he is to be compensated in full for his loss or not; since after he has fortuitously disposed of a long-lived asset use of the composite rate will return to him less than his actual loss, even though to some other taxpayer, retiring a short-lived asset, overcompensation will result. We think it follows that a fair application of the theory of the composite rate requires that compensation to the owner should not be left to chance, but that in each instance the facts should be examined to determine what rate of depreciation applicable to the specific asset will properly allow for depreciation attributed to it.

It is also true that, except in the specific instances which will be further discussed, where respondent has himself furnished such evidence, the record is lacking in the facts upon which a precise determination of the anticipated life of the various assets can be made and, of course, it is true that the burden was upon petitioner to prove all necessary facts.

But this is not to say that no loss whatever may be allowed. From what has been said it is apparent that in the instances where petitioner has shown an abnormal retirement it has actually suffered some loss.

In that situation "the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making * * *. The amount may be trivial and unsatisfactory but * * * [it is] wrong to refuse any * * *." *Cohan* v. *Commissioner*, 39 Fed. (2d) 540 (C. C. A., 2d Cir.).

Proceeding upon that principle, we have included in our findings of fact statements of the rates at which depreciation should be computed in determining the losses affecting the individual properties. The rates so found are necessarily estimates based upon the known facts and the necessity of bearing heavily against the taxpayer. The assumption has been made that the assets in question were anticipated to have lives at least as long as they are shown actually to have been in use; and, since their retirement is assumed to have been premature, that even this does not measure the full span of anticipated life. But since we have no way of knowing whether they were retired one year or ten before their natural death, we have computed the depreciation rates by adding only one year in each case to the number of years of life which the asset is already shown to have had. With respect to assets acquired in 1918 or before, the loss computed at the composite rate is not sufficiently different from that computed on the theory just described for us to feel warranted in making any change in petitioner's claim; except that as to certain tank cars, items 171 through 181 of Annex 10 to the stipulation, there is a sufficiently drastic gap between composite and anticipated depreciation to result in the necessity of applying the former method of approximation.

The specific assets to which the foregoing discussion refers are set forth in detail in our findings of fact. As to the other assets, we are sustaining respondent's determination that no loss should be allowed for the following reasons:

The losses claimed may generally be divided into two groups. As to the property shown on Annexes 8 through 12 to the stipulation (paragraphs (a) through (e) of the findings of fact), losses were claimed by petitioner in its tax returns. As to these we have allowed all losses where petitioner has, in our opinion, sustained its burden of proving that the properties were abnormally abandoned or sold in the years before us. As to all other properties in this group, we conclude that petitioner has failed to show, as we think it was required to do, that the retirements in question, if they took place in the instant years, were abnormal, or, in one instance, that they were not compensated for by fire insurance. Losses have not been allowed where properties were destroyed, junked, lost, or stolen but the year when that occurred has not been shown, or has been shown to be a year not in issue; where the loss is unallowable because the properties were worn out, indicating presumptive normal retirement or, as is now conceded

by petitioner, were traded in for other equipment or transferred to other plants; and as to one group of properties, where it affirmatively appears that the destruction was by fire and that the property was covered by fire insurance, but no showing as to the amount of recovery thereon has been made.

The second group, Annexes 13 through 17 (paragraphs (f) through (j) of our findings of fact) were claimed as losses by amended petitions, but not in the returns.

With respect to the properties included in paragraphs (f) and (g) of our findings of fact, Annexes 13 and 14 to the stipulation, there is no evidence whatever of abandonment in the tax year, although that is the ground upon which the losses are claimed as to those assets. Cf. *Real Estate Land Title & Trust Co.* v. *United States*, 309 U. S. 13. If we regard abandonment from the standpoint of the physical action taken, there is no evidence that the properties were actually retired from use in 1928, but such as there is indicates that in all probability the usefulness and value of the properties had disappeared in prior years. There is no evidence that petitioner's president, Brown, in whom apparently the authority rested, ever gave instructions to abandon the property, or, if he did so, that that occurred in the tax year. And if we regard abandonment from the standpoint of intention, we find that the properties in question were not written off the taxpayer's books until several years later and that the property cards therefor were not canceled until even after that. In fact, there is nothing in the record relating to the year 1928 which in any way sustains the petitioner's burden of proving abandonment in that year. The engineer's report listing properties which might be subject to write-off lacks force, both because it fails to show that actual abandonment had already occurred and because further action upon it, which would be necessary to make it effective, does not appear. For these reasons we have found as a fact that this property was not abandoned in the year 1928.

With respect to the properties included in paragraphs (h) and (i) of our findings of fact, Annexes 16 and 17 to the stipulation, we are unable to conclude that the evidence shows an abandonment in either of the years in question. The properties involved are the buildings and machinery comprising petitioner's distilling plant at New Orleans, and generally referred to as the Louisiana distillery. Upon all of the facts, set out in greater detail in our findings, we have concluded that the action of petitioner in 1928 and 1929 was not such as to constitute abandonment. While the production of alcohol was suspended, operation of the property as a bonded warehouse and denaturing plant was continued, the latter for a limited period. Certain repairs and replacements were made in 1928 and permits and bonds for the continued operation of the plant were in effect through-

out the period. As late as October 1, 1929, an application for a permit for the calendar year 1930 was filed. At this time the state of petitioner's business was such as to make it possible that there might yet be a future for the operation of the plant. Under these circumstances we can not regard abandonment as having been shown for either of the instant years.

The properties described in Annex 15 to the stipulation (paragraph (j) of our findings of fact were the buildings and equipment comprising the Cottrell precipitator and the ammonia sulphate plant. As to the precipitator, petitioner's evidence shows that the properties were abandoned by reason of the necessity of installing new and improved equipment. It was apparently not because the old machinery or the old plant was worn out or used up. Respondent himself submitted evidence dealing with the anticipated normal life of the items of property involved. These are set forth in full in our findings. With respect to all but one of such properties, item No. 53 (part acquired in 1924), this evidence shows that retirement was premature. For this reason we have allowed a loss as to all of the properties included in the Cottrell precipitator, save such part of that one item. In this case, since the anticipated lives are shown by the evidence even though produced by respondent, we have in our findings computed the depreciation allowable on the basis of such evidence of normal life. The losses are to be adjusted by the use of such depreciation figure. We have disallowed the claim with respect to the ammonia sulphate plant for the reason that the evidence shows that this plant was not abandoned in the tax years. While it was not being operated, the reason was the low price of ammonia sulphate. There is no ground for assuming that if the price had improved operations would not have been resumed. There is no concrete evidence of permanent abandonment.

On this issue decision will be entered under Rule 50, the losses allowed to be computed as set forth herein.

### Issue V.—Boats.

#### FINDINGS OF FACT.

Since 1907, the Cuba Distilling Co. has been engaged in the Republic of Cuba principally in the business of purchasing, storing, and transporting by water blackstrap molasses for use in production of alcohol.

Due to lack of deep water harbors, particularly on the south coast of Cuba, it was necessary to collect molasses from mills located on the shallow water and transport it by means of lighters and tugs to storage plants or to ocean-going ships of the Cuba Distilling Co. at deep water points. Such collection and transportation constituted

coastwise trade within the meaning of the laws of the Republic of Cuba.

At all times material in these proceedings, the laws of the Republic of Cuba required that steamers, tugs, and lighters engaged in coastwise shipping be owned by a citizen or corporation of Cuba.

The Cuba Distilling Co., solely for the purpose of complying with the said laws of the Republic of Cuba, caused to be formed and organized under those laws a corporation by the name of Compania Cubana de Transporte de Mieles, sometimes herein referred to as the Transporte Co.

At all times material in these proceedings, all of the capital stock of the Transporte Co. was owned by the Cuba Distilling Co.; it had no employees other than its officers or directors; its books and records were kept by its officers and directors, who were also officers of the Cuba Distilling Co.; its accounts show $1,600 paid as administrative salaries in the year 1928; it kept no bank account during the taxable years in question; all of its tangible property, which consisted of tugs, tank steamers, and tank lighters engaged in coastwise shipping in Cuba, were registered in the name of the Transporte Co. and entered on its books as its assets; they constituted the only operating assets of the Transporte Co., were in the actual physical possession of the Cuba Distilling Co. and were operated and maintained by it, under an oral agreement between the Cuba Distilling Co. and the Transporte Co. The terms of this agreement are set out in an affidavit, executed by Russell R. Brown and filed by the petitioner with the Bureau of Internal Revenue on June 9, 1931, which reads as follows:

RUSSELL R. BROWN, being duly sworn, deposes and says:

That in 1928 he was President of the Cuba Distilling Company, a corporation organized and incorporated under the laws of West Virginia. That the Cuba Distilling Company at that time was the owner of one hundred percent of the capital stock of the Compania Cubana de Transporte des Mieles, incorporated under the laws of Cuba, hereafter referred to as Transporte Company;

That the Transporte Company was organized under the laws of Cuba to do coastwise shipping in and around the island of Cuba, and was incorporated for the purpose of complying with the Cuban laws:

That the Transporte Company operated a fleet of coastwise boats and lighters for the sole purpose of transporting molasses to concentration points to be picked up by boats of the Cuba Distilling Company:

That a verbal agreement was made between the Cuba Distilling Company and the Transporte Company that the Cuba Distilling Company would take over all the boats of the Transporte Company and operate them, the Cuba Distilling Company taking care of all operating expenses. The Cuba Distilling Company also was to take care of depreciation on the boats and all other charges of any nature that would accrue in connection with the operation of the boats:

That, in accordance with said verbal agreement, the Transporte Company on December 31, 1928, in its regular course of business, charged the Cuba Distilling Company by journal entry #49 with $325,773.98, covering $285,773.98 expended by the Cuba Distilling Company in operating boats and $40,000.00 depreciation accrued during the year 1928.

That in February 1928 the Transporte Company also charged the Cuba Distilling Company with $5,000.00 loss sustained in the sale of the lighters Rosa and Matilda. No depreciation was taken in 1928 on these two boats.

Deponent further states that this arrangement was a fair and reasonable one under the then existing conditions and that, if the Cuba Distilling Company had chartered boats of an outside concern at that time, the cost would have been very much greater than actual operating cost, plus accrued depreciation, which it agreed to pay to the Transporte Company.

On August 19, 1931, the Cuba Distilling Co. and the Transporte Co. entered into the following written agreement:

THIS AGREEMENT made this 19th day of August 1931, by and between CUBA DISTILLING COMPANY, hereinafter referred to as "Cuba", party of the first part, and COMPANIA CUBANA DE TRANSPORTE DE MIELES, hereinafter referred to as "Transporte", party of the second part,

WITNESSETH:

THAT, WHEREAS, on January 1, 1928, the parties hereto made an oral agreement continuing in effect the arrangement heretofore in force, under the terms of which all its steamers, lighters, launches and other equipment of Transporte are operated for the account of Cuba; and, further, under the terms of which, Cuba pays all operating expenses of every nature and description, and depreciation, including the replacement value of any boats or steamers lost, less salvage and insurance as rental therefor, which arrangement is still in force; and

WHEREAS, both parties wish to reduce this oral agreement, under which these companies have been operating since January 1, 1928, to writing, the parties hereto agree as follows:

I. Transporte agrees to lease all of its steamers, lighters and boats to Cuba for the purpose of transporting products of Cuba, or such other companies as Cuba may designate, exclusively;

II. Cuba agrees to pay Transporte for the use of all the steamers, lighters, launches and other equipment, the total of all the operating expenses, including depreciation and including any loss by Transporte through the perils of the seas or inland waters, said payment or payments to be made during or at the end of the fiscal year.

III. This agreement shall be in force for the fiscal year, 1931, and continue from year to year thereafter until either party notifies the other of its desire to cancel such agreement by 90 days written notice prior to December 31 of any year.

During the year 1928, various persons (other than the Transporte Co. or corporations affiliated with the Cuba Distilling Co.) paid to the Cuba Distilling Co. the sum of $24,240.23 for services rendered in transporting goods for such persons in said tugs, tank lighters, and tank steamers. Said sum was retained by the Cuba Distilling Co. under said oral agreement and was included by it in its gross income for the taxable year 1928.

At the beginning of the taxable year 1928, it was determined by the Cuba Distilling Co. that $40,000 was the proper amount to be credited to the Transporte Co. by the Cuba Distilling Co. under the provisions of the above mentioned oral agreement.

The depreciation reserve of the Cuba Distilling Co. was created by monthly charges to profit and loss at a fixed rate per gallon of

molasses handled and the amounts of such charges were concurrently credited to depreciation reserve. The total net charges so made to profit and loss and credited to depreciation reserve during the year 1928 was $246,543.38. Petitioner's affiliate, the Cuba Distilling Co., deducted under the heading "depreciation" as part of item 20 in the consolidated return for the year 1928 the aforesaid $246,543.38.

The respondent determined that the allowance for depreciation for the taxable year 1928 with respect to the property of the Cuba Distilling Co. was $186,980.74, and respondent allowed this amount as a deduction from the income of the Cuba Distilling Co. and disallowed the balance of the $246,543.38. Respondent thereby increased the taxable net income of the Cuba Distilling Co. by the amount of $59,562.64. This adjustment was made by respondent in item (f) of schedule 6 of the notice of deficiency for the taxable year 1928 attached to the amended petition (Docket No. 90714).

During the calendar year 1928, the Cuba Distilling Co. expended $285,773.98 in and about the operation and maintenance of the aforesaid tugs, tank lighters, and tank steamers of the Transporte Co., which was paid by the Cuba Distilling Co. out of its own funds and deducted from the income of the Cuba Distilling Co. as part of its expenses of operation. On December 31, 1928, the Cuba Distilling Co. credited the Transporte Co. with $40,000 and charged a like amount to depreciation reserve. No part of the credit of $40,000 made by the Cuba Distilling Co. to the Transporte Co. was deducted in the consolidated return for the calendar year 1928, unless and except to the extent that it may have been included in the item of $246,543.38 aforesaid.

Entries were made on the books of the Transporte Co. as follows:

12/31/28

Dr.—Cuba Distilling Company_____ $325, 773. 98
    Cr.—Boat Operations_____ $285, 773. 98
    Cr.—Reserve for Depreciation_____ 40, 000. 00

12/31/28

Dr.—Boat Operations_____ $285, 773. 98
    Cr.—Cuba Distilling Company_____ $285, 773. 98

The respondent concedes that the restoration of $40,000 to the income of the Cuba Distilling Co. for the year 1928 appearing in item (b) of schedule 6 of the notice of deficiency in Docket No. 90714 is erroneous.

At the beginning of the taxable year 1929 it was determined by the Cuba Distilling Co. that $60,000 was the proper amount to be credited to the Transporte Co. by the Cuba Distilling Co. under the provisions of the above mentioned oral agreement.

The total net charges made in 1929 by the Cuba Distilling Co. to profit and loss and credited to depreciation reserve at a fixed rate

per gallon of molasses handled was $386,094.23. Petitioner's affiliate, the Cuba Distilling Co., deducted under the heading "depreciation" as part of item 20 in the consolidated return for the year 1929 the above mentioned $386,094.23.

The respondent determined that the allowance for depreciation for the taxable year 1929 with respect to the property of the Cuba Distilling Co. was $186,663.22, and respondent allowed this amount as a deduction from the income of the Cuba Distilling Co. and disallowed the balance of the $386,094.23. Respondent thereby increased the taxable net income of the Cuba Distilling Co. by the amount of $199,431.01. This adjustment was made by respondent in item (a) of schedule 4 of the notice of deficiency for the taxable year 1929 attached to the amended petition (Docket No. 90713).

On December 31, 1929, the Cuba Distilling Co. charged depreciation reserve with the amounts of $45,083.50 and $14,916.50 and credited like amounts to the Transporte Co. The total of $60,000 was treated on the books of the Cuba Distilling Co. and on the books of the Transporte Co. in the same manner as the item of $40,000 was treated by said companies for the year 1928 as hereinabove set forth. No part of said credits aggregating $60,000 made by the Cuba Distilling Co. to the Transporte Co. was deducted in the consolidated return for the calendar year 1929, unless and except to the extent that it may have been included in the item of $386,094.23 aforesaid.

The Cuba Distilling Co. has never paid in cash to the Transporte Co. or to anyone else the whole or any part of the amounts of $40,000 and $60,000 credited as hereinbefore set forth.

On January 1, 1928, January 1, 1929, and January 1, 1930, there were registered in the name of the Transporte Co. the following named steamships, tugs, and lighters which were carried on the books of the Transporte Co. at the amounts shown:

| Name | Book cost | | |
|---|---|---|---|
| | Jan. 1, 1928 | Jan. 1, 1929 | Jan. 1, 1930 |
| Steamships: | | | |
| Mambi | $311,637.25 | $311,637.25 | $311,637.25 |
| Regina | 100,079.52 | 100,079.52 | 100,079.52 |
| Jucaro | | 126,046.26 | 126,046.26 |
| Tugs: | | | |
| Maceo | 39,585.96 | 39,570.96 | |
| Lighters: | | | |
| Rosa | 7,750.00 | | |
| Matilda | 7,750.00 | | |
| Laura | 28,091.29 | 28,091.29 | 28,091.29 |
| Graziola | 23,542.97 | 23,542.97 | 23,542.97 |
| Fifi | 23,542.97 | 23,542.97 | 23,542.97 |
| Marti | 54,287.38 | 54,287.38 | 54,287.38 |
| Pamico | 27,870.56 | 27,870.56 | 23,870.56 |
| Tuxpam | 30,290.93 | 30,290.93 | 30,290.93 |
| Margaret | 24,704.57 | | |
| Liborio | 50,649.98 | | |
| Helen | 17,368.73 | 17,368.73 | 17,368.73 |
| Santa Maria II | 15,083.66 | | |
| Samson | 35,182.27 | | |
| Miguelito | 30,000.00 | 30,000.00 | 30,000.00 |
| Elizabeth | 500.00 | | |
| Total | 827,918.04 | 812,328.82 | 772,757.86 |

Petitioner contests respondent's action under schedule 6, item (f), and schedule 4, item (a), of the respective notices of deficiency only to the extent of $40,000 for the year 1928 and $60,000 for the year 1929. These are the amounts in issue for the respective years.

The right of petitioner's affiliate, the Cuba Distilling Co., to a deduction of certain amounts resulting from its use of the boats belonging to its subsidiary, the Transporte Co., would have to be denied if it were advanced on the theory of a deduction for depreciation. See *Mississippi River & Bonne Terre Railway*, 39 B. T. A. 995. But it is claimed on the ground that use of the boats resulted in a contract liability to pay an amount sufficient to cover the depreciation sustained by the owner, and that charges and credits on the Distilling Co.'s books of the sums claimed are the equivalent of such payments, since it is on the accrual basis. *Andrew Jergens Co.*, 40 B. T. A. 868, 873. We think the record supports the claim as so advanced.

The Transporte Co., being a foreign corporation, was not embraced in the consolidated return of petitioner and its affiliates, including the Distilling Co. Revenue Act of 1928, secs. 141 (e) and 142 (c). For present purposes we are accordingly justified in regarding it as separate from the tax standpoint.

Of the contract and the book entries there is no question. The actual amount to be paid was unspecified, but it was ascertainable by reference to the depreciation suffered. Such amounts were in fact determined upon for each of the instant years and recorded contemporaneously. They may have been generous and inconsistent. But, in the face of evidence of petitioner's decision that they were proper, we are not disposed to indulge in speculations to the contrary, especially in default of the production by respondent of any concrete basis therefor. On this issue decision will be for the petitioner.

*Issue VI.—Taxes Paid to the Cuban Government.*

### FINDINGS OF FACT.

During the years 1927, 1928, and 1929 the Republic of Cuba imposed a tax of one-fourth of 1 percent on the export of money or the value of other property or products exported from Cuba to foreign countries, payable at the time of exportation. Regulations promulgated under the law imposing the tax provided that the tax would be refunded if the exporter within 90 days submitted proof of the reentry of the exported property or products or the cash equivalent derived from the export made.

During the years 1927, 1928, and 1929 the Cuba Distilling Co. exported molasses from Cuba, and with respect thereto paid export taxes in the total amount of $19,066.22 as follows:

| | |
|---|---:|
| 1927 | $7,723.65 |
| 1928 | 5,779.44 |
| 1929 | 5,563.13 |

The amounts of said payments were charged to an account designated "Impuesto de ¼ del 1%", which the Cuba Distilling Co. carried on its books maintained at Havana. On December 31, 1929, said account contained a debit balance of $19,066.22. In the income tax returns for 1927 and 1928 no deduction was taken or allowed for the export taxes paid in those years, but in the consolidated income tax return for 1929 said amount of $19,066.22 representing the total of such taxes paid during the years 1927 through 1929 was taken as a deduction from the gross income of the Cuba Distilling Co. The respondent disallowed the entire amount as a deduction, stating: "Charge against income representing the cancellation on the New York books of a receivable from the Cuban Government of tax returnable to the taxpayer under certain conditions. The item is still on the Havana books but thought to be of doubtful value by the home office. It is held that the account should stand until ascertained to be uncollectible."

The Cuba Distilling Co. filed claims with the Cuban Government for refund of $1,176.68 of the export taxes paid in 1927, but apparently filed no claim with respect to the remainder of $6,546.97 of such taxes paid in that year. No refund of any of the taxes paid in 1927 has ever been received. Claims for the refund of $5,509.44 of the taxes paid in 1928 were filed, but no claims were filed for the remaining $270 of such taxes paid in 1928. Payment of said $270 was made on October 13, 1928. No refund of any of the taxes paid in 1928 has ever been received. Claims were filed for the refund of the entire amount of the taxes paid in 1929, namely, $5,563.13. During 1930 the Cuba Distilling Co. received from the Cuban Government cash refunds of taxes in the total amount of $5,297.09, of which $3,321.24 was for refund of export taxes paid in 1929. Said refunds were credited to the "Impuesto de ¼ del 1%" account on the books at Havana. The debit balance in said account on December 31, 1930, was $20,071.76.

#### OPINION.

Although a deduction of $19,066.22 was taken in the consolidated income tax return for 1929 against the income of the Cuba Distilling Co. on account of Cuban export taxes paid during the years 1927 through 1929, the petitioner does not now contend that such deduction should be allowed in full. Its position is that the amount paid

in 1928 should be allowed as a deduction in that year as accrued taxes, and that the amount paid in 1929, less the part thereof which was refunded in 1930, should be allowed in 1929. It does not now claim any portion of the taxes paid in 1927, for which year petitioner's income tax liability is not before us. The sums of $5,779.44 for 1928 and $5,563.13, less the refund which we have found to be $3,321.24, or $2,241.89 for 1929, are therefore the amounts now in issue.

We can not agree with respondent's contention that petitioner is seeking to place itself upon a cash basis for the purpose of obtaining these deductions. The taxes apparently became a liability upon export and were then properly accruable. Having been paid, they could be recovered only in the event of favorable action upon the claim for refund. Accrual of that claim might, of course, offset the deduction resulting from the accrual of the tax liability. Whether it could do so depends upon the accruability of the claim for refund. In our view it was so contingent and uncertain both as to liability on the part of the Cuban Government and as to amount that its accrual as an account receivable would have been unwarranted. See *Jamaica Water Supply Co.*, 42 B. T. A. 359, and cases there cited. Deduction for taxes accrued and paid in the respective years should therefore be permitted.

Petitioner concedes that the amounts of the 1929 taxes actually refunded in 1930 should be charged against the 1929 payments, since that year remains open. See *Estate of William H. Block*, 39 B. T. A. 338, 341; affd., 111 Fed. (2d) 60. Under such circumstances, petitioner's claim as now advanced for the taxes of 1928 and 1929, less the amount of the 1929 refund received in 1930, is sustained.

*Issue VII.—Respondent's Claim of Excessive Allowance for Depreciation.*

### FINDINGS OF FACT.

Upon the acquisition of the properties acquired by the petitioner indirectly from Kentucky at a purchase price of $8,500,000 paid in stock, the petitioner charged its "Property" account with $5,100,000 as representing the portion of the purchase price which it allocated to the tangible properties acquired. On the general books of the petitioner only one account was carried for property, without distinction as to classification, but classified accounts were carried on separate plant property ledgers.

On April 1 and June 1, 1930, certain entries were made, breaking down the amount of $5,100,000 as between the Atlas, Westwego, and Louisville plants (the three plants acquired indirectly from Kentucky) and setting up classified accounts for the respective plants. By said entries $600,000 of the $5,100,000 was set up in the

plant ledger with respect to the property at the Atlas plant, $3,700,000 was set up with respect to the property at the Westwego plant, and $800,000 with respect to the property at the Louisville plant. These amounts were assigned by the petitioner's New York office as the cost of the respective plants. The explanations recorded on the journal vouchers made in connection with the above mentioned entries were as follows respectively:

Transferring from Ky. Alc. Co. (unsurveyed) the value of Atlas Plant and setting same up as surveyed property as per the following classifications. [For classification see below.]

* * * * * * *

Ky. Alc. Co. to Westwego (all classes) Setting up classified values as per Property Survey.

* * * * * * *

Transferring from Ky. Alc. Co. (unsurveyed) the value of Louisville Plant and setting same up as surveyed property as per the following classifications. [For classification see below.]

The classifications and the amounts of each which were entered on the petitioner's plant ledgers in accordance with the above mentioned transfer vouchers were (except the total column) as follows:

| Classification | Plant | | | Total |
| | Atlas | Louisville | Westwego | |
| --- | --- | --- | --- | --- |
| 1. Land | $8,000.00 | $40,000.00 | $73,598.00 | $121,598.00 |
| 2. Buildings | 138,463.80 | 274,777.72 | 452,075.00 | 865,316.52 |
| 3. F & F (Furniture and Fixtures) | 4,017.00 | 3,972.75 | 3,824.50 | 11,814.25 |
| 4. Boilers | 1,936.00 | 2,100.00 | 168,000.00 | 172,036.00 |
| 5. Fermenters | | | 48,200.00 | 48,200.00 |
| 6. Dist. Equip | | | 376,665.00 | 376,665.00 |
| 7. Out (side) Tanks | 33,821.00 | 11,009.00 | 581,500.00 | 626,330.00 |
| 8. Wharves & Docks | | | 5,000.00 | 5,000.00 |
| 10. M. & E. (Machinery and Equip.) | 68,704.00 | 26,108.00 | 272,535.05 | 367,347.05 |
| 19. Autos | 1,431.64 | 4,935.00 | 3,756.23 | 10,122.87 |
| 25. Switch Tracks | | 5,000.00 | 3,350.00 | 8,350.00 |
| 26. Pipe Lines | 4,970.00 | 2,500.00 | 66,960.00 | 74,430.00 |
| 29. Non-Utilized Equipment | 338,656.56 | 429,597.53 | 1,644,536.22 | 2,412,790.31 |
| Total | 600,000.00 | 800,000.00 | 3,700,000.00 | 5,100,000.00 |

A condensed classification of the foregoing is as follows:

| | |
| --- | --- |
| Land | $121,598.00 |
| Buildings | 865,316.52 |
| General equipment | 1,700,295.17 |
| Nonutilized equipment | 2,412,790.31 |
| Total | $5,100,000.00 |

The figures on Kentucky's books covering its land, buildings, machinery, and equipment on June 15, 1929, were $2,586,597.17, undepreciated, and $1,644,516.57, depreciated. The Westwego plant, including buildings, was in good condition in 1929. However, there was a settling of the storage tanks which had carried down some of the walkway around the tanks, but the floors as a whole were in good

condition, and so far as could be determined at that time were structurally sound. In 1934 the petitioner considered rehabilitating the Westwego plant and, after a complete engineering survey of all of the petitioner's New Orleans production facilities had been made, the petitioner decided to rehabilitate its International plant, which was done. Thereafter the Westwego plant was used only for the storage of molasses.

The annual productive capacity in 1929 of the Westwego plant was approximately 15,000,000 gallons, of the International plant about 12,000,000 gallons, and of the Louisville plant 8,000,000 or 9,000,000 gallons.

In determining the deficiency for 1929 the respondent determined that the cost of depreciable property acquired by the petitioner indirectly from Kentucky was $4,978,402. Of that amount $4,113,085.48 was included in the machinery and equipment group of property with respect to which the respondent allowed a deduction for depreciation at an annual rate of 8 percent for one-half of the year 1929.

By an amended answer the respondent asks for an increased deficiency for 1929, assigning as error in his original determination his inclusion in the basis for depreciation of certain nondepreciable property which had a cost basis to the petitioner of $2,412,790, more or less, and alleging that said included property was not in 1929 or now used in the petitioner's trade or business. By a reply timely filed the petitioner denied the respondent's assignment of error and the allegation as to the nonuse of the property.

### OPINION.

Respondent contends that the evidence shows that, of the property acquired indirectly from Kentucky, the $2,412,790.31 entered on the petitioner's books as "Non-Utilized Equipment" did not represent the cost of any property subject to depreciation for the reason that no such property existed as tangible property, or if it did exist it was not used in the petitioner's trade or business and that 4 percent (depreciation at the rate of 8 percent allowed by respondent with respect to the petitioner's machinery and equipment for one-half of 1929) of said $2,412,790.31, or $96,511.61, was erroneously allowed as depreciation for 1929 and should be restored to taxable income and the deficiency for 1929 increased accordingly.

With the exception of requests to find (1) that $2,565,611.69 constituted the cost of all of the depreciable property acquired by the petitioner indirectly from Kentucky for stock, and (2) that the respondent erred in including in the petitioner's basis subject to depreciation and in allowing any depreciation on the amount of $2,412,790.31 as being the cost appropriate to nondepreciable property or to equipment not utilized by the petitioner in its trade or business dur-

ing 1929, we have found substantially all the facts requested by the respondent. In our opinion neither the facts so found nor the evidence warrants our reaching the ultimate conclusions embodied in requests (1) and (2). The mere designation on the books in the following year of certain of the property as "non-utilized" would be scant justification for a conclusion that the property was in fact not used in petitioner's business in the year before us. See *Doyle* v. *Mitchell Brothers Co.*, 247 U. S. 179. But the evidence as a whole makes that result even less tenable, for if the entry be regarded as in some degree ambiguous, petitioner's employee, Gosnell, called as a witness on this issue by respondent, explained it as designating the remaining portion of the cost which has never yet been distributed to or spread over the assets acquired at the respective plants. So far as he knew all this property was used in the petitioner's business in 1929.

The record thus fails to sustain the burden of proof which, on this issue, was respondent's. The proposed increase in the deficiency is disapproved.

### The Claim of Overpayment.

While recognizing that petitioner may contest the deficiencies on grounds which have not been the subject of any claim filed within the statutory period, respondent points out that petitioner's right to a refund of any amount which may be found to constitute an overpayment depends on a determination by the Board as a part of its decision that such amount was paid within two years before the filing either of a claim for refund or of the petition, whichever is earlier. Revenue Act of 1938, sec. 809 (c). Respondent's further contention that the claims so required do not exist here need be considered only in the event that computation of the tax due in accordance with the conclusions reached in this report shows that some overpayment results. Under such circumstances we are not disposed to pass upon a question which may prove to be purely academic. Consideration of the matter may await the computations under Rule 50 and its disposition, if that becomes necessary, will follow at that time and in that connection.

Reviewed by the Board.

*Decisions will be entered under Rule 50.*

---

MURDOCK, concurring: Although I concur in the result reached on all points, I do not subscribe to all that is said in the majority opinion or the methods used therein to reach the results. The petitioner has failed to show that the Kentucky contracts had any particular basis and that is sufficient reason for denying the belated claim for deduction on account of exhaustion of those contracts.

Likewise, the belated claim for depreciation on the drums is not supported by sufficient evidence. The petitioner regularly employed a sound system of accounting for the drums which would return to it the full cost of those drums without any deduction for depreciation as such. It charged its customers for each drum furnished to them and was thus fully compensated for all drums which the customers failed to return or which were not accepted upon return. It charged off to profit and loss the cost of all drums which it discarded. It was fully compensated in those two ways for the cost of all drums which it was using in its business. This is not to say that it could not have offered proof to support a deduction for depreciation of the drums. For example, had it changed its accounting method in regard to the drums, set up upon its books a proper basis for depreciation for the drums, and proved what its or some other's experience had been in regard to the exhaustion of cost of drums in such a business, together with proof of how many of the drums it was compensated for through sale of unreturned drums to its customers, some deduction might have been permissible. But in the absence of some such complete proof of a satisfactory method no deduction is permissible.

The petitioner apparently claims a deduction on account of loss for assets retired at the end of their estimated useful lives and also a deduction for loss when assets were retired prior to the end of their estimated useful lives. Obviously, assets abandoned in other years could not give rise to a loss deduction in the taxable year. But it appears that some of the assets were abandoned in the taxable years. The evidence does not show that the petitioner is entitled to any loss on account of any asset which was abandoned in the taxable year at the end of its estimated useful life. In fact, it is difficult to imagine any circumstances under which any taxpayer would be entitled to deduct a loss where an asset was abandoned at the end of its estimated useful life. Deductions for depreciation would apparently fully compensate any taxpayer for an asset thus abandoned.

A taxpayer might or might not be entitled to deduct a loss where an asset was abandoned prior to the end of its estimated useful life. That would depend upon the method used by the particular taxpayer in recovering the cost of its assets through deductions for depreciation and exhaustion. Such a deduction for loss might be proper under some methods but would not be proper under others, and many methods are properly used for recovering the cost of assets through depreciation and exhaustion. The record does not show adequately just what method has been used by this taxpayer, and, without rather complete knowledge of the method used in the past and the recovery under that method, it is humanly impossible to determine whether

or not the petitioner is entitled to a deduction for loss in the taxable years when it abandoned assets prior to the end of their estimated useful lives.

The Commissioner argues, however, that under the method which he seems to deem appropriate this taxpayer would be entitled in theory to a deduction for loss upon the abandonment of assets during the taxable years prior to the end of the useful lives of those assets. The loss, he says, would be the difference between the unrecovered cost of the asset, applying a rate of depreciation based upon the estimated useful life of that asset, and deducting salvage value, if any. This is a concession upon the part of the Commissioner. The evidence in regard to the system used by the taxpayer in prior years is insufficient to enable me to say that this theory of the Commissioner is incorrect. The petitioner argues that the composite rate applying to all assets in the group should be applied to the particular asset in computing the loss, instead of a rate based upon the estimated life of that particular asset. It may be that such a method would be proper if consistently used by some taxpayer, but the evidence does not justify a reversal of the action of the Commissioner upon that basis. The estimated life of the separate assets retired during the taxable years has not been shown, and therefore no deduction is justified in excess of that allowed in the prevailing opinion.

SMITH, VAN FOSSAN, LEECH, ARNOLD, and DISNEY concur in the above.